John T. Casey, J.
In this action for a declaratory judgment the plaintiffs seek to set aside various rules and regulations of the defendant, the Agriculture and New York State Horse Breeding Development Fund (herein Fund) and to enjoin the Fund from proceeding according to those rules and regulations. One plaintiff is a membership corporation whose members own harness horse breeding farms and harness racing horses within New York State. The other, a member of that corporation, breeds, owns and races harness horses.
In 1965, the Legislature established the Fund and directed it to provide annually for harness horse races to be known as the “ New York sire stakes” (herein Sire Stakes). (Pari-Mutuel Revenue Law, §§ 99-a,-99-e, subd. 2; L. 1940, ch. 254, as amd. by L. 1965, ch. 567, § 2, renum. art. IV, L. 1970, eh. 1023, § 1.) The Sire Stakes must be run at each licensed pari-mutuel track in the State which for the sake of identification are: Batavia, Buffalo, Goshen, Montieello, Saratoga, Vernon, Roosevelt and Yonkers. The races are divided into classes according to the horses’ age and gait (trotter or pacer) and, most significantly, are open only to harness horses bred in New York State. (Pari-Mutuel Revenue Law, § 99-e, subd. 2.)[1]
The Fund is financed by the pari-mutuel tracks; each contributes a percentage of the breaks of all moneys deposited in its pari-mutuel betting pools. (Pari-Mutuel Revenue Law, § 99-c, subd. 1.) In turn, the Fund contributes to those tracks for Sire .Stakes purses. To determine the contribution, the tracks are divided into two groups based upon their average daily pari-mutuel betting pool. (Pari-Mutuel Revenue Law, § 99-e, subd. 4.) The Fund contributes “ not less than forty per cent nor more than fifty per cent ” of the money available for Sire Stake purses to tracks with an average daily parimutuel betting pool of less than $750,000. (§ 99-e, subd. 4.) The remainder is distributed to tracks with an average daily pari-mutuel betting pool of more than $750,000. (§ 99-e, subd. 4.) Each track receives an amount in the proportion that *673 such track’s contribution to the Fund bears to the total contribution of the tracks in the group. (§ 99-e, subd. 4.) Apparently, from the inception of the Sire Stakes program, and for some time thereafter, any harness horse that ¡satisfied the requisites of subdivision 2 of section 99-e was eligible to run in any race. For the horse racing seasons of 1972 and 1973, however, the Fund changed the format of the Sire Stakes. Certain races for each class and gait were designated as the “ Finals ” and were to be held one year at Yonkers and the next year at Roosevelt. The purse for those races was substantially higher than the purses for any other Sire Stakes race. Eligibility for the “Final ”, however, was predicated upon a ‘ ‘ point qualification system ’ ’. Under the ‘[1] point qualification system ”, whether a horse could run in the “ Final” hinged upon the number of points it had accumulated. The Fund specified a certain number of points to be awarded to the first, second, third and fourth place horses at the Sire Stakes races at Batavia, Buffalo, Goshen, Monticello and Vernon. In addition, the Fund directed that twice the amount of points awarded at a Sire Stakes race at those tracks would be awarded at a “ semifinal ” race to be held at Saratoga. Upon the completion of the Sire Stakes events at Batavia, Buffalo, Goshen, Monticello and Vernon the first four horses in order of point standing were eligible for the ‘ ‘ Final ’ ’. Only the then noneligible horses could compete in the “ semi-final ”, and the next six horses in order of point standing became eligible. Under certain circumstances additional horses could be added to the field.
The plaintiffs argue that the Fund does not possess the power to limit eligibility for the Sire Stakes, and, therefore, it exceeded its statutory authority when it established the point qualification system. Alternatively, the plaintiffs claim that if the Fund possessed such power, the point qualification system should be vacated because it is contrary to the legislative purpose. They ask this court to declare the point qualification system unconstitutional and to enjoin the Fund from sponsoring the Sire Stakes under that system. Furthermore, they seek to enjoin the Fund from limiting the eligibility of harness horses at Yonkers, Roosevelt and Saratoga Raceways.
Before proceeding to the merits, a procedural objection raised by the defendant must be considered. Specifically, the defendant argues that plaintiffs ’ remedy was by a proceeding under article 78 of the CPLR instead of this action for a declaratory judgment. Even if the present action were converted to that proceeding the defendant claims the plaintiffs could not succeed *674 because the proceeding would be barred by the four-month Statute of Limitations. There was no statutory provision for a notice and a hearing by the Fund prior to promulgating the point qualification system. The action taken by the Fund was, therefore, legislative rather than judicial or administrative. An action for a declaratory judgment is a proper vehicle to review legislative acts. (Matter of Lakeland Water Dist. v. Onondaga County Water Auth., 24 N Y 2d 400.) Thus, the procedural objection raised by the defendant is untenable.
The defendant points to subdivision 5 of section 99-e as authority for establishing the point qualification system. It provides: “ 5 The fund shall have the power to prescribe rules and regulations to determine the eligibility of entries in ‘ New York bred harness horse races ’ and to effectuate the purposes and requirements set forth in this section.” The plaintiffs argue that despite the rule and regulation making power of the Fund, it may not establish eligibility requirements. According to the plaintiffs, the Legislature established the eligibility requirements for the Sire Stakes in subdivision 2 of section 99-e and thereby precluded the Fund from altering those requirements. Insofar as the eligibility of horses is concerned, the Fund, plaintiffs continue, under its rule and regulation making power, may only establish rules and regulations which will enable it to ascertain whether a harness horse was bred in conformity with subdivision 2 of section 99-e.
I would agree with the plaintiffs if the Legislature had made every harness horse that fell within the requisites of subdivision 2 of section 99-e eligible for the Sire Stakes. By so doing, the Legislature would have bestowed eligibility upon any such horse. Instead, however, the Legislature directed the Fund “ to provide for * * * stake events * * * conditioned tp admit only * * * horses dropped from a mare bred in this state ” (§ 99-e, subd. 2). (Emphasis added.) By choice of the underlined words the Legislature simply excluded from eligibility for the Sire Stakes those horses which were not dropped from a mare bred in this State or sired by a stallion permanently standing for service within this State at the time of the foal’s conception. It did not make every horse bred in conformance with the statutory requisites eligible. Viewed in this light, the rule-making power the Fund possesses is not limited to establishing a system whereby it could obtain information concerning the age, gait and parentage of a horse. Thé Fund may use its expertise and limit the eligibility of horses, if such action is consistent with the purposes of the Act. Accord *675 ingly, the Fund did not exceed its statutory authority when it created the point qualification system.
Although the defendant had the power to establish additional eligibility criteria, the point qualification system may be arbitrary and capricious. To put this issue in proper perspective a recitation of background information is necessary. As previously stated, the Legislature divided the racing tracks into two groups according to the amount of their betting pools. Apparently, Yonkers and Roosevelt Raceways comprised one group; the other raceways comprised the second. The purses at Yonkers and Roosevelt were always substantially higher than the purses at the other tracks. Due to that disparity the owners of the more talented New York State bred harness horses would compete in the lucrative Sire Stakes races at Yonkers and Roosevelt, but would avoid the races at the second group of tracks where the purses were not so significant. By so doing they could enter the prestigious and lucrative races known as the “ Grand Circuit ”.[2] The absence of talented horses in the Sire Stakes races at the lesser tracks caused a diminution of public interest. Indeed, occasionally a Sire Stakes race was run “ off the card ”, or, as a nonbetting race. The point qualification system induces a horse owner to enter several Sire Stake races. He must enter his horses in the races at the lesser tracks, if he hopes to enter the horse in a “ Final ’ ’. Plaintiffs claim that due to the scheduling of the Grand Circuit races they must choose between running in the Grand Circuit races or in a qualifying Sire Stakes race. Thus, they are unable, as before, to enter only the most lucrative Sire Stakes races and the Grand Circuit races. In plaintiffs ’ own words, point qualification system has deprived them of “ the best of two worlds ”.
The obvious purpose of the point qualification system is to insure that some quality New York bred harness horses will be entered in each Sire Stakes race. Public interest in the races will be generated, presumably resulting in a greater betting pool and thereby providing the Fund with more money, some of which will be funneled to the lesser tracks. The plaintiffs claim the system violates the basic purpose of the act which is to promote horse breeding within the State. (Pari-Mutuel Revenue Law, § 99-a.) According to the plaintiffs, horse breeding would be best promoted by continuing to make the best of “ both worlds ” available to the plaintiffs.
*676 In addition to the promotion of horse breeding the Legislature, however, also expressed interest in other related areas. Section 1 of chapter 567 of the Laws of 1965 provided: “ The legislature reiterates and declares it to be in the definite interest of the state, to promote and develop agriculture generally and the improvement of the breeding of horses particularly. The legislature further declares that the revenues the state has received from pari-mutuel betting since its inception, are of vital necessity to the support of state government, and that the large amount of real estate and school tax moneys paid by the harness tracks and horse breeding farms are of great importance to the support of local government; that the large number of persons employed in the horse breeding farms’ industry, when added to the multitude of people employed in the many fields of endeavor that supply the horse breeding farms, the harness racing tracks and affiliated operation constitute an important part of the economy of the state. The legislature further declares that state and local revenues will be vitally affected, and the state’s economy likewise will be affected unless measures are taken to encourage the breeding and development of standard-bred horses, and the retention in this state of contending horses to meet the growing demand for such animals, to maintain the harness racing tracks presently in operation ”.
Thus the Legislature intended to promote horse breeding through a plan which would also promote those other interrelated activities. The success of the entire plan turns to some degree upon the success of the smaller race tracks. Obviously, the point qualification system is consistent with the over-all statutory plan. Accordingly, the Fund was not arbitrary in creating that system.
The plaintiffs also argue that the Fund exceeded its authority when it ran less than 12 races at a particular harness track. The Legislature directed the Fund ‘[1] to provide for a minimum of six stake events at each such licensee harness track * * * at each gait of trotting and pacing ’ ’ (Pari-Mutuel Revenue Law, § 99-e, -subd. 2). The Fund, therefore, despite its over-all rule and regulation making power, must run at least 6 races at each track at each gait or a minimum of 12 races. Accordingly, that relief requested by plaintiffs should be granted.
I have considered the other arguments of the plaintiffs and find them to be without merit.
The relief requested by plaintiffs is denied except as to the request concerning the running of a minimum, of 12 races at each track. With regard to the latter the relief is granted.

. Subdivision 2 of section 99-e provides in pertinent part: The fund is further authorized and directed in each year, in cooperation with each licensee harness track in this state, to provide for .the running of a minimum of six stake events at each such licensee harness track conditioned to admit only two year old and three year old colts and Allies and four year old horses dropped from a mare bred in this state and sired by a stallion owned or leased and permanently standing for service at and within this state at the time of the said foal’s conception, at each gait of trotting and pacing, to be known as “New York sire stakes” and to contribute to the purses, stakes or prizes to be awarded in such “ New York sire stakes ”, such sums as the fund shall deem advisable.

. The “ Grand Circuit ” is a series of races throughout the United States and Canada which attract the best harness horses.