[615 NYS2d 714]

Town of Southampton, Respondent, v Equus Associates, Ltd., Appellant, et al., Defendants. (Matter No. 1.)

In the Matter of Equus Associates, Ltd., Appellant, v Town Board of the Town of Southampton et al., Respondents, and John H. Doyle et al., Intervenors-Respondents. (Matter No. 2.)

Second Department, August 8, 1994

### APPEARANCES OF COUNSEL

*Shea & Gould,* New York City *(Milton S. Gould, Robert J. Ward, Karen S. Frieman* and *Robert J. Kirshenberg* of counsel), for appellant.

*Linda Riley, Town Attorney* of the Town of Southampton *(D'Amato, Forchelli, Libert, Schwartz, Mineo & Carlino,* Mineola *[Anton J. Borovina],* of counsel), for respondents.

*Twomey, Latham, Shea & Kelly,* Riverhead *(John F. Shea, III, Christopher D. Kelley* and *Lisa C. Kombrink* of counsel), for John H. Doyle and others, intervenors-respondents.

*Anderson, Kill, Olick & Oshinsky,* New York City, for R. Mark Keenan, intervenor-respondent.

### OPINION OF THE COURT

MILLER, J.

The primary issue presented on these two appeals is whether the appellant's proposed use of its leased property to raise, train and sell polo ponies constitutes "agricultural production" within the meaning of Agriculture and Markets Law § 301, and therefore should have been permitted by the Town of Southampton. We hold that it does and accordingly reverse the judgments on appeal and grant the petition of Equus Associates, Ltd. and dismiss the complaint of the Town of Southampton.

The instant appeals stem from attempts by appellant Equus

Associates, Ltd. (hereinafter Equus) to obtain permission from the Town of Southampton (hereinafter the Town) to erect six prefabricated dirt floor barns on a 65-acre parcel of property, on which it seeks to raise, train, and sell polo ponies. The property, owned by defendant Gail O. Tiska and leased by Equus, is subject to an indenture entered into by Ms. Tiska and her late husband in 1982, pursuant to which the landowners agreed to sell their "Development Rights" to the Town, retaining only the rights to use the property for "agricultural production as that term [was then] defined in Section 301 of the New York State Agricultur[e] and Markets Law". The indenture was executed pursuant to the Town's Farmland Preservation Program (Town Code of Town of Southampton § 330-50), the purpose of which was to preserve agricultural, open lands within the Town.

In holding that Equus's proposed use of the property was unauthorized, the Supreme Court construed a 1981 amendment to the Town Code of the Town of Southampton (hereinafter the Town Code), which expressly added horseback riding academies and horse stabling facilities to the list of permitted uses not alienated by the sale of development rights (Town Code of Town of Southampton § 330-50, nn 33, 34). The court reasoned that the 1981 amendment, which was not incorporated into the 1982 indenture, was not intended by the parties to be included in the indenture. However, even assuming that the court was correct in this determination, Equus's proposed use of the property still comports with the terms of the indenture without reference to the amendment.

The Supreme Court also relied on an opinion of the State Board of Equalization and Assessment (hereinafter SBEA) which held that the breeding of horses for purposes other than for sale is not agricultural production. This opinion, however, is not only distinguishable, but is contrary to the Legislature's intent and case law in this State. The SBEA's opinion determined that the breeding of horses for the purposes of scientific research, specifically toxology experiments, was not agricultural production, as that term was defined in Agriculture and Markets Law § 301 (3 Opns Counsel SBEA No. 100). The SBEA concluded that horses must be bred for actual sale in order to be considered as agricultural production (supra). Even if we were to accept the SBEA's conclusion, Equus's proposed activities would still qualify as agricultural production. In the case at bar, Equus intends to breed and raise horses for the purpose of selling polo ponies.

The breeding of horses has long been considered an important agricultural interest of New York. "The legislature reiterate[d] and declare[d] it to be in the definite interest of the state, to promote and develop agriculture generally and the improvement of the breeding of horses particularly" (L 1965, ch 567, § 1). New York courts have concurred and recognized the Legislature's intent *(New York Standardbred Farm Owners v Agriculture & N. Y. State Horse Breeding Dev. Fund,* 71 Misc 2d 671, 676; *see also,* McKinney's Uncons Laws of NY § 8041 [Pari-Mutuel Revenue Law § 99-a; L 1965, ch 567, § 2, renum by L 1970, ch 1023, § 1, as amended], now Racing, Pari-Mutuel Wagering and Breeding Law § 330).

When the indenture was executed, Agriculture and Markets Law § 301 read, in pertinent part: "Agricultural production [is defined as t]he production for commercial purposes of all crops, livestock and livestock products, including, but not limited to the following * * * horses" (§ 301 [3] [e]). Taking words for their plain and unambiguous meaning, as we must, the production of horses must be included in the definition of agricultural production.

It is noteworthy that no New York court has held that the breeding of horses does not constitute "agricultural production" as defined in Agriculture and Markets Law § 301. In fact, *Matter of Kinderhill Farm Breeding Assocs. v Walker* (54 AD2d 811, *affd* 42 NY2d 919) holds that the breeding of thoroughbred race horses is agricultural production as defined in section 301. In *Kinderhill* the petitioner sought to compel the Chatham Town Board to issue a mobile home license incident to its farming operation. Kinderhill was the owner of 140 acres of land, upon which it bred, raised and sold thoroughbred race horses. The subject property was located in an area restricted to agriculture and commercial horse farms and riding academies. The Town Board had denied Kinderhill's application, finding that that petitioner did not operate a farm as defined in the Town Zoning Ordinance, and therefore, was not entitled to the mobile home license available to legitimate farms. The Third Department held that the Town's view was "plainly erroneous and lack[ed] a rational basis" *(supra,* at 812). The Court further held, citing Agriculture and Markets Law § 301, that the Zoning Ordinance demonstrated a clear intent "to include petitioner's operation within the contemplated farm enterprises; that is, the breeding of horses" *(supra,* at 812). The Court thus concluded that section 301 included the breeding of horses *(supra,* at 812).

*Kinderhill (supra)* and the case at bar are plainly analogous. In the case at bar, petitioner seeks to breed, raise, train, and sell polo ponies. In *Kinderhill,* the petitioner operated a farm at which thoroughbred race horses were bred, raised, trained, and sold. In both cases the petitioners owned property located in areas in which permitted uses were restricted and in each case these restrictions were defined, *inter alia,* by implicit or explicit reference to Agriculture and Markets Law § 301. Clearly, the parallels between *Kinderhill* and the instant appeals dictate that a parallel resolution should follow.

Additionally, it is most significant that Equus's proposed use of the subject land does not violate, subvert, or frustrate the admitted purpose of the Town Farmland Preservation Program. Among the goals of the program are to: "provide the open rural land use environment so highly valued by those persons who support the Town of Southampton's recreational and resort economy, as well as by year-round residents * * * Therefore, as a matter of public policy, the Town of Southampton designates those specific land areas as the Agricultural Overlay District in order to encourage and to make economically feasible *the preservation of these lands for agricultural purposes."* (Town Code of Town of Southampton, art X, § 330-47 [A] [emphasis added].)

Equus intends to build prefabricated dirt floor barns which can be removed, without difficulty, by subsequent owners. These barns would occupy only one third of one acre and thus, the vast remainder of the 65-acre plot would be used for paddocks, thereby satisfying the goal of open spaces and preserving land for agricultural purposes. Ned B. Stiles, a board member of the Group for the South Fork, intervenors in this action, who opposed the Group's support of the Town's position, sums up eloquently in his letter dated October 11, 1991:

"the issue presented here is not fundamentally an environmental one; it is essentially political. In fact, the staff's position has ignored the strictly environmental considerations here, the preservation of open space, soil conservation and the protection of the underground water supply, all of which mitigate in favor of encouraging horse farming on Eastern Long Island. * * *

"I believe the Group has made a fundamental error in this case which has produced a bad result for the East End, not because of the apparent defeat for polo, but because a serious

cloud has been cast over the legitimacy of all horse farming activities on preserved farmland. This is an unnecessary and unwise result for which the Group's activities are largely responsible. The Group's public support is founded on its concern for environmental preservation. It is not, in my view, commissioned to make lifestyle choices for the area that are not directly linked to the preservation of natural resources."

Moreover, it is clear that the local opposition, to which Mr. Stiles alluded, was largely the result of unwarranted warnings by certain groups that Equus would erect a polo stadium and turn the community into a parking lot for a large scale spectator sports facility. However, Equus seeks permission only to operate a horse farm, incidental to the training of the polo ponies. Equus acknowledges that section 330-162.1 (J) of the Town Code would prohibit large scale polo spectator events. Accordingly, the only potential fear raised by Equus's opponents is unfounded.

In sum, since Equus's proposed use of the property to train and sell polo ponies constitutes "agricultural production" within the meaning of Agriculture and Markets Law § 301, and is consistent with the objectives of the Town's Farmland Preservation Program, Equus's petition should be granted, and the Town's action for a permanent injunction should be dismissed.

BRACKEN, J. P., SULLIVAN and HART, JJ., concur.

Ordered that the judgment dated January 24, 1992, dismissing the CPLR article 78 proceeding, is reversed, on the law, without costs or disbursements, the petition is granted, the determination dated September 11, 1991 is annulled, the application for a construction permit is granted, and the matter is remitted to the respondents for the imposition of any appropriate conditions; and it is further,

Ordered that the judgment dated January 24, 1992, permanently enjoining the appellant from engaging in its proposed equestrian activities, is reversed, on the law, without costs or disbursements, the cross motion to dismiss the complaint is granted, and the complaint is dismissed.