**EQUUS ASSOCIATES LTD., Plaintiff,**

v.

**THE TOWN OF SOUTHAMPTON, the Town Board of the Town of Southampton, Fred Thiele, Martha Rogers, Douglas Penny, Patrick Heaney, Jr., Michael Walsh, George Stavropoulos, Marietta Seaman, James Needham and Patricia Neumann, Defendants.**

**No. CV 94–4274 (ADS).**

United States District Court, E.D. New York.

Feb. 27, 1999.

Fischbein, Badillo, Wagner & Harding, New York City (Bruce N. Lederman, Dwight S. Chase, of Counsel), for Plaintiff.

Rosenstein, McKenna & Bonney, Middletown, NY (Monte J. Rosenstein, of Counsel), for Defendants.

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

In this Section 1983 action, the plaintiff Equus Associates Ltd. ("Equus" or the "plaintiff") alleges that the defendants, the Town of Southampton (the "Town"), its Town Board, the current Town Board members, the past Town Board members who sat on the Board during the relevant time period, and the former Town Attorney, Michael Walsh (collectively the "defendants"), engaged in an unbridled abuse of power when they unlawfully saddled its application for a building permit to erect six barns on its property for the purpose of breeding, raising and selling polo ponies. The plaintiff's mane complaint is that the defendants trampled on its civil rights in failing to issue the building permit.

Following motions for summary judgment by both sides, the Court rendered a decision on August 27, 1997, which, among other things, dismissed the plaintiff's substantive due process Section 1983 cause of action. *See Equus Associates Ltd. v. The Town of Southampton*, 975 F.Supp. 454 (E.D.N.Y.1997). At issue in this non-jury trial is the plaintiff's Section 1983 cause of action based on equal protection of the laws. At the risk of beating a dead horse, the plaintiff's moves to amend the complaint to "resurrect" its Section 1983 substantive due process claim together with other causes of action.

## I. BACKGROUND

This opinion and order includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a) and 65(d). *See Rosen v. Siegel*, 106 F.3d 28, 32

(2d Cir.1997); *Colonial Exchange L.P. v. Continental Cas. Co.*, 923 F.2d 257 (2d Cir.1991).

The plaintiff, Equus Associates Ltd., is a New York corporation in the business of breeding, raising, training, stabling and selling horses for recreational riding and for playing polo. Anthony E. Tiska, Jr., now deceased, and Gail O. Tiska ("the Tiskas") were the owners of a 65 acre parcel of farmland located in Bridgehampton in the Town of Southampton. The Tiskas were participants in the Farmland Preservation Program ("Farmland Program" or "Program") (Town Code of the Town of Southampton § 330.50) which was designed to preserve agricultural open lands within the Town. In 1982, acting under the terms of the Farmland Program, by way of an Indenture, the Tiskas sold their "development rights" to the Town for the sum of $637,000, retaining only the right to use the property for "agricultural production" as that term is defined in the New York State Agricultural and Markets Law. *See* N.Y. Agric. & Mkt's L. § 301.

When the indenture was executed, New York Agricultural and Markets Law § 301 read, in pertinent part: "Agricultural production is defined as the production for commercial purposes of all crops, livestock and livestock products, including, but not limited to . . . horses."

The Southampton Hunt & Polo Club ("the Polo Club") is a private membership club organized to promote and provide facilities for polo matches. On March 12, 1990, the Polo Club leased the 65 acre parcel of land from the Tiskas, for the purpose, among other things, of training and stabling polo ponies. On April 30, 1990, the Polo Club assigned the lease to the plaintiff corporation. Members of the Polo Club had organized Equus to operate an equestrian facility on the 65 acre parcel, which operation would include the stabling and training of polo ponies.

According to the plaintiff, the Tiskas became participants in the Farmland Program in reliance upon an amendment to the Town Code of the Town of Southampton ("Town Code"), enacted on May 26, 1981 pursuant to which the Town Board added "Horse Back Riding Academy and Horse Stabling Facilities" to the list of permissible uses for land governed by the Program (the "1981 amendment"). Equus alleges that as result of the 1981 amendment, the number of participants in the Farmland Program increased from one to fifteen.

On February 28, 1991, Equus applied to the Town Board for a permit to erect six prefabricated dirt floor barns which could be removed without difficulty by subsequent owners. The barns would occupy only one-third of one acre on the 65 acre plot. The permit states that: "The subject premises is a parcel of 65 acres which is the central most portion of a parcel of 89 acres owned by the Tiskas. As can be seen from the enclosed Sketch Plan, the applicant proposes to construct six (6) barns (each with a total of 21 stalls), seven (7) paddocks, fencing for the entire 65 acres area as well as parking for 62 cars."

The projected use in the permit was "stabling and training for polo ponies." The description of the project was as follows: "Applicant is tenant of owners and seeks to maintain stabling and training facility for polo ponies on the subject premises for development rights of which were sold to the Town of Southampton."

The Equus Special Exception Petition dated October 1, 1990, in pertinent part, states as follows:

1. Applicant seeks a special exception for a horse farm, horse stabling facility, and horseback riding academy pursuant to Section 69—24NN, Zoning Ordinance.

. . . . .

10. The premises shall be used for a horse farm and horse stabling facility for the enjoyment of the members and guests of the Southampton Polo Club. . . . Petitioner shall from time to

time and consistent with the uses allowed under Section 69–24NN(10), Zoning Ordinance, engage in the playing of polo matches at the subject premises.

The plaintiff alleges that at the time of the application, two other Farm Program participants, David Birdsall and Seong Jik Moon, used their properties for horse riding and horse stabling.

Construction of the barns at issue is governed by the Southampton Town Code § 330–50D(2), which states:

Construction permit. The Town Board shall be empowered to authorize construction by the issuance, after a public hearing, of a permit, as follows:

(a) For the construction of buildings and other structures customarily accessory and incidental to agricultural production as same is presently defined by § 301 of the New York State Agriculture and Markets Law; provided, however, that no such permit shall be issued for the erection or maintenance of any building or other structures intended for human habitation.

(b) All construction permit applications shall be referred by the Town Board to the Farmland Committee which shall investigate the application and report its recommendations to the Town Board.

(c) Any construction permit issued pursuant to this section shall be subject to such conditions and limitations as the Town Board shall see fit, in the reasonable exercise of its discretion, to impose.

Prior to the filing of the application for the construction permit, Equus brought onto the leased site approximately 60 polo ponies. Also, polo matches among members were held several times a week, allegedly for the purpose of training the polo ponies. In addition, prior to the filing, Equus erected fencing, graded and seeded certain areas, installed water lines and equipment and hired a professional polo player from Argentina named Tolo Ocam-

po to teach polo playing to the Polo Club members on the leased property. Equus alleges that it expended in excess of $300,-000 in obtaining, improving and maintaining the property.

The plaintiff's permit application was referred to the Town's Farmland Committee to investigate and report its recommendation to the Town Board. On April 16, 1991, the Committee issued its report stating that "the use as proposed by Equus was a use which would fall within the spirit and language of the Town's Farmland Preservation Program." The Farmland Committee report stated that Section 301 of the Agricultural and Markets law defined agricultural production as "[t]he production for commercial purposes of all crops, livestock and livestock products, including but not limited to horses." The Committee concluded that:

the inclusion of horse farms, horse stabling facilities, and horse back riding academies was something that was within the general contemplation of the Town at the time of the passage of the Development Rights Program and immediately thereafter, as witnessed by the 1981 amendments/clarification of the Town Code expressly to include horseback riding academies and horse stabling facilities to permitted agricultural uses as defined by Section 301 of the Agriculture and Markets Law.

Based upon all of the foregoing, it is the conclusion of the Southampton Town Farmland Committee that the application of Equus Associates Ltd. pursuant to Section 330–50D(2) of the Town Code for the construction of buildings and other structures customarily accessory and incidental to agricultural production as proposed by the applicant and as indicated in the documents and submissions referred to above, is proper and appropriate under the Southampton Town Farmland Program.

The Farmland Committee further determined that because the Tiskas joined the Farmland Program after the 1981 amend-

ment, it would be reasonable to conclude that in selling their development rights to the Town, they relied on the fact that the land could still be used as a horseback academy or horse stabling facility.

After receipt of the Farmland Committee report, the Town Board asked the Town Attorney for an opinion as to the plaintiff's proposed use of the land. The Town Attorney, Michael Walsh, submitted an initial opinion memorandum to the Town Board dated April 23, 1991 (Pl.Ex. 3). In this letter, Walsh stated that the New York State Constitution and the General Municipal Law prohibited the plaintiff's proposed use of the land, and that equestrian uses of the property would be contrary to the intent of the Farmland Program.

Nevertheless, Walsh proposed an amendment to the Farmland Program to "prohibit horse stabling facilities and/or horseback riding academies," which would apparently have the effect of repealing the 1981 amendment relied upon by the Tiskas. The Town Board then requested an "advisory opinion" from the Town Planning Board regarding the plaintiff's permit application. On June 20, 1991, the Town Planning Board issued an opinion asserting that the 1981 amendment was "legally defective" (Pl.Ex. 4). However, the Town Planning Board conceded that:

1) The horse farm aspect of this application if fully complying with New York Agriculture and Markets Law Section 301 is approvable under said statute and the stabling of horses for said purpose as accessory to this use is also approvable . . .

2) The training of such horses for sale as polo ponies should not extend to the point where polo matches or similar sport activities would be carried on said lands where the Town has purchased these development rights. . . .

3) Despite the Town Code amendment of May 26, 1981, which appears to be legally defective and which is also contrary to the original intent of the basis

and language upon which the public acted in referendum vote of November 4, 1980, a horse stabling facility for lease, rent or hire of riding horses, and a horseback riding academy with all that it implies are recreational purposes that this Board advises against approving.

The Town Planning Board also concluded that:

Given that some farmers may have signed agreements with the Town which relied on the Code Amendment of May 26, 1981, the Town Board should examine the procedures for allowing such farmers to purchase back from the Town their development rights.

On August 7, 1991, the Town Attorney issued a second opinion memorandum (Pl. Ex. 5), which discussed the 1981 amendment and the language in the Indenture. The second opinion memorandum concluded that:

[T]he present Board would have a good chance of prevailing in the event it wishes to rely on the terms of the deed and deny the use proposed by the applicant. Alternatively, if the Board finds that the circumstances surrounding the transaction warrant a re-interpretation of the provisions of the deed, the Board does have the legal authority to permit, the proposed use since the major legal barrier, that is, the 1980 referendum, is not binding due to the aforesaid technical defects.

On September 10, 1991, the Town Board rejected the plaintiff's permit application by a three to one vote. Defendants Stavropoulos, Needham and Seaman voted to deny the permit. Defendant Neumann voted to grant the application.

After the Town Board rendered its decision, Equus filed an Article 78 proceeding in New York Supreme Court, Suffolk County. The Town brought a separate action for a permanent injunction to prevent the plaintiff from engaging in equestrian activities on the property. On January 24, 1992, the Supreme Court (Oshrin, J.)

dismissed the plaintiff's Article 78 proceeding and granted a permanent injunction against Equus. In reaching its decision, the court relied on the fact that the Tiskas' indenture agreement did not expressly reference the 1981 amendment to the Town Code and the opinion of the State Board of Equalization Assessment which determined that horse breeding for purposes other than sale did not constitute agricultural production under state law. Thereafter, in accordance with the order of the Supreme Court, Equus vacated the property.

On appeal, on August 8, 1994, the Appellate Division, Second Department reversed the trial court's decision, vacated the injunction, annulled the Town Board's determination denying the permit application, and granted the plaintiff's Article 78 petition and its request for a construction permit. *See Town of Southampton v. Equus Assocs. Ltd.*, 201 A.D.2d 210, 615 N.Y.S.2d 714 (2d Dept.1994). In reaching its decision, the Appellate Division framed the issue as "whether [the plaintiff's] proposed use of its leased property to raise, train and sell polo ponies constitutes 'agricultural production' within the meaning of Agriculture and Markets Law § 301, and therefore should have been permitted by the Town of Southampton." *Id.* at 714. In answering this question in the affirmative, the court relied on the language of section 301 and the Third Department's decision in *Kinderhill Farm Breeding Assocs. v. Walker*, 54 A.D.2d 811, 388 N.Y.S.2d 43 (3d Dept.1976), *aff'd*, 42 N.Y.2d 919, 397 N.Y.S.2d 1006, 366 N.E.2d 1360 (1977). Agriculture and Markets Law § 301 defines "agricultural production" as "[t]he production for commercial purposes of all crops, livestock and livestock products, including, but not limited to the following: ... horses." *Equus*, 615 N.Y.S.2d at 715. Consistent with this definition, in *Kinderhill,* the Third Department held that the breeding of thoroughbred race horses constituted agricultural production as defined in section 301. *Id.* Further, the Second Department found

that Equus's proposed use of the land was consistent with the purpose of the Farmland Program, namely:

> [to] provide the open rural use environment so highly valued by those persons who support the Town of Southampton's recreational and resort economy, as well as by year-round residents ... Therefore, as a matter of public policy, the Town of Southampton designates those specific land areas as the Agricultural Overlay District in order to encourage and to make economically feasible *the preservation of these lands for agricultural purposes.*

*See id.* at 716, quoting Town Code, article X § 330-47[A] (emphasis by the Appellate Division). Finally, the court relied on a letter dated October 11, 1991, submitted by Ned B. Stiles, a board member of the Group for the South Fork, which was an intervenor in the Article 78 proceeding and who opposed the Group's support of the Town's position. The letter stated that the Town Board's decision to deny the permit was political rather than environmental and grounded on a "fundamental error" by the Group. The Court further concluded that local opposition was "largely the result of unwarranted warnings" and an "unfounded" rumor that Equus sought to erect a polo stadium and parking lot. *Id.* As a result of these factors, the Appellate Division ordered that the Town Board grant Equus's application for the construction permit. The matter was remitted to the Town Board "for the imposition of any appropriate conditions." *Id.* at 716–717.

In reliance on the Appellate Division decision directing the issuance of a permit, Equus re-entered the property pursuant to a subsequent lease with the new owners, utilizing a smaller portion of the parcel consisting of 44 acres instead of the original 65 acre parcel.

At the trial, the Court raised its concern with the length of time that elapsed after the Appellate Division decision directing

the issuance of a permit and none being issued. The Court was advised by Southampton Deputy Town Attorney Wayne Bruyn of the following facts: In 1995, a public hearing was held by the Town Board and, on August 18, 1995, a resolution was adopted issuing the construction permit to the plaintiff with six stated conditions. Among the conditions was a site plan review and the obtaining building permits. According to Bruyn no action was taken by the plaintiff for more than two years, until September 1997. In addition, certain steps were taken by the plaintiff in 1998. On April 3, 1998, the plaintiff submitted a completed site plan, which was approved by the Planning Board on June 4, 1998, apparently resulting in the issuance of the required permits on June 19, 1998, with certain conditions.

At the time this bench trial concluded on May 20, 1998, notwithstanding the Appellate Division direction, no construction permit had been issued. However, at the closing arguments on January 29, 1999, as stated above, the Court was advised that permits were issued to the plaintiff on June 19, 1998, subject to a number of conditions.

This lawsuit was commenced on September 9, 1994. The plaintiff's First Amended Complaint contained three causes of action based on the defendants' alleged violation of its constitutional rights under (1) the due process clause, (2) the equal protection clause, and (3) the takings clause. Both sides moved for summary judgment. In its decision dated August 27, 1997, reported at 975 F.Supp. 454, the Court granted the defendants' motion to dismiss the substantive due process claim. Thus, the two causes of action that remained were (1) the Section 1983 equal protection claim, and (2) the Section 1983 takings claim. It was noted that, in the plaintiff's post-trial memorandum of law, there was no reference to the takings cause of action. During closing arguments, plaintiff's counsel confirmed that Equus was not pursuing the takings claim.

In addition, the plaintiff moved: (1) pursuant to 28 U.S.C. § 1367, to exercise supplemental jurisdiction over the State law issues now being presented; (2) pursuant to Rule 15(a) of the Federal Rules of Civil Procedure ("F.R.C.P."), for an order permitting plaintiff to amend the complaint to include a State law cause of action for a mandatory injunction compelling the issuance of a permit; and (3) pursuant to F.R.C.P. Rule 15(d), for an order permitting the plaintiff to supplement the complaint due to defendants' continued failure to issue a permit. As stated above, the Court at closing arguments was advised that the permits were issued to the plaintiff with the imposition of certain conditions. Therefore, in the Court's view, the plaintiff's motion for the above stated relief, has been rendered moot.

## II. *THE TRIAL—ADDITIONAL FINDINGS OF FACT*

George Stavropoulos was a Supervisor of the Town of Southampton in 1990 and 1991. Prior to the filing of the permit application he had conversations at a neighbor's house regarding a "polo complex" that the plaintiff's principals were interested in. He is familiar with the Farmland Program and he testified that it is not "clear" that horse farms and horse riding facilities were acceptable uses under the Program.

Stavropoulos knew Anthony Tiska all of his life and was familiar with his 65 acre potato farm, which was leased to Equus. He is also familiar with David Birdsall who is a "horseshoer" and is "very much into horses and that type of thing." However, he doesn't know if Birdsall's property is subject to the Farmland Program.

Stavropoulos was the Town Supervisor when Equus filed its permit application on February 28, 1991. He lost his bid for reelection in November 1991. He is familiar with a newspaper advertisement entitled "Save It. Don't Pave It." by the organization called "Group for the South Fork."

(Pl.Ex. 8). The Group for the South Fork is an environmental organization based in the Hamptons, which was active with regard to zoning issues in the Town of Southampton. This ad says, among other things:

10,548 tax payers voted to preserve farmland by buying development rights. Now, ten years later, there is a new law that allows preserved farmland to be used for recreational/commercial purposes including riding academies, horse shows and rodeos complete with spectator events and parking lots. The law also allows 24,000 square foot stadiums on the very land you thought was preserved. 24,000 square feet is as large as half a football field.

Imagine these stadiums and parking lots dotting Scuttlehole Road in Bridgehampton. Tell the Town Board to hold the horses. Write to the Town Board and ask them to repeal Section 330-162.1 of the Town Code and the 1981 Amendment that allows for non-agricultural uses on land already preserved.

Apparently, at the time this ad was published in the newspaper, the Equus project may have been the only horse or polo-related facility on Scuttlehole Road in Bridgehampton. Therefore, it can be inferred that the "Save It. Don't Pave It." ad related to the Equus facility. However, Stavropoulos stated that "It's ridiculous to say I was swayed" by the ad. In answer to the Court's questions he indicated that the "Save It. Don't Pave It." sentiment was "the feeling of the people that they don't want building going on, they want to preserve the natural farmland, the open spaces."

Stavropoulos was shown a series of newspaper articles, letters to the editor and cartoons relating to the Equus application (Pl.Ex. 7). However, he denied that the Group for the South Fork "expected that he would vote a certain way with respect to Equus's application." Nor did he tell any member of the Town Board, including Patricia Neumann, that pressure was being exerted on him.

With regard to the Equus permit application, there was a requirement that it be referred to the Farmland Committee and the Planning Board. After some evasion, Stavropoulos conceded that the Farmland Committee report was favorable to the Equus application. He also conceded that the Farmland Committee had some expertise in these matters. The Planning Board report was mixed, in that it stated that the horse farm aspect was approvable but not to the extent that there could be polo matches on the land. The latter portion of the Planning Board report raised an issue as to whether it was in conflict with the May 26, 1981 amendment to the Town Code which added "Horseback Riding, Breeding and Horse Stabling Facilities" to the list of permissible uses.

When the Town Board voted to reject the Equus application on September 10, 1991, Stavropoulos was a member of the Town Board, which consisted of four Town Board members and the Supervisor. Despite the favorable Farmland Committee report, the partially favorable Planning Board report and the Town Attorney's opinion that the Board had the legal authority to permit the proposed use, Stavropoulos voted against the Equus proposal after "evaluating all the reports."

Q So the Farmland Committee said it's approvable, the Town Planning Board said it's approvable, and the Town Board ultimately voted three to one not to approve the proposal by Equus?

A That's correct.

Q What was the basis for your vote of "no"?

A The basis for my vote for "no" was the reports of the Legal Department, Town Attorney's Office, the knowledge that I had personally—this gives me an opportunity, perhaps, to say what I feel, how I felt personally about zoning and about this particular use based on what I understood zoning to be and what I thought was the best decision for the

590

people of the Town of Southampton, that's what I voted for, that's how I voted, that's what I was elected to do.

.  .  .  .  .

Q  I understand that. What I'm trying to do, Mr. Stavropoulos, is I'm trying to understand the basis of the Town Board's rejection of this application. The matter was referred to the Farmland Committee, the Town Planning Board and legal counsel, the Town Attorney all of whom said either it's approvable and now I want to understand why it is that the Town Board did not approve the application.

MR. ROSENSTEIN: Note my objection. It's been asked and answered several times.

THE COURT: Overruled.

A  I can only answer why I voted the way I voted.

Q  Why did you disapprove?

A  Because—can I answer this without -

THE COURT: Yes.

A  It gives me a chance because I felt personally that that would not be a good use for that particular piece of property, considering the Farmland Preservation Program and its original intent, and I felt that I could not get a clear answer as to whether they were going to have polo matches there. They said they weren't going to have matches, then they said they were going to have matches, then they said they weren't going to have matches. Then they said, "How can you train horses to play polo unless you have matches?"

I said, "You are going to have matches, are people going to watch?"

"Yeah, but we won't have spectators." If you don't have spectators, people won't come to watch. So the whole thing was unclear and I don't believe the intent of the Farmland Preservation Law, as we wrote it, and our intent should allow polo matches to take place and it turns out historically and it turns out we made the right decision at the

right time and that's why I voted the way I voted and no other reason. Because I understood planning, I understand the intent and I was involved in Farmland Preservation for 19 years and I know when I made that decision I made it based on what I thought and I was elected to make the decisions as I saw them and that's what I did.

Tr. at 64–65, 75–77.

However, Stavropoulos conceded that Equus never indicated they were going to build a bleachers, a grandstand or a stadium. In any event, he was opposed to any polo matches of any kind on the Equus property; even to train polo ponies. This is so even though he was a member of the 1981 Town Board that enacted the amendment permitting horseback riding and riding academies.

Stavropoulos testified that the Town Board was not compelled to follow the recommendations of the Farmland Committee or the Planning Board. Also, the Equus application included the use of 62 paved parking spaces and an entire acre for the parking of horse vans on the property. In addition, he noted that the business of the Southampton Polo Club, the alter ego of Equus, was playing polo matches. Further, the Tiska Indenture, for which the Town paid $647,000, did not reserve the right to carry on an activity such a polo matches on the property. In his opinion, there should be no polo matches on the Tiska property because its development rights were purchased by the public.

Significantly, Stavropoulos testified that there was "a lot of pressure put on from both sides." Asked if that pressure influenced his vote, he responded in a somewhat equivocal fashion, "I like to think it did not." (Tr. at 92). Also, with regard to the newspaper ads, he stated he didn't "believe" that they influenced his vote.

Offered in evidence by the defendants was an opinion by the New York State Board of Equalization and Assessment,

dated May 31, 1974 (Def.Ex. A), which stated that "the breeding of horses for scientific research is not 'agricultural production' within the meaning of Article 25A of the Agriculture and Markets Law."

Stavropoulos believed that the Equus application was the first made under the Farmland Program, and as such, was precedent setting and would require careful treatment. Considering all of the circumstances, he stated that his decision to vote against the application was made in good faith.

Frank MacNamara is a principal in Equus and the Southampton Polo Club, as is Attorney Lawrence Graev. While there were 14 members of the Southampton Polo Club, only 5 were members of Equus. Equus was formed in 1989 or 1990. The plan was to lease the Tiska property and the Southampton Polo Club would arrange to use the fields to play polo Their plan was to erect six dirt floor polo barns, each holding 20 exterior stalls with some paved parking. The remaining approximately 60 acres would be grass and paddocks (fenced fields).

MacNamara testified that Equus never planned to build any kind of stadium or bleachers, nor did it plan to hold public polo matches, except as to charity events. He stated that people would not be willing to pay for the level of polo that his members play. The polo matches were held to train the polo horses. He stated that "the basic business plan was to breed, raise and sell polo ponies" in association with the Southampton Polo Club, which, at that time had 14 members "at most." (Tr. at 109–110). According to MacNamara, the only way one can train polo horses is by having polo matches, in which they can get used to the mallet and contact with other horses. MacNamara gave an example that you can only train a jumping horse by actually having the horse jump. The Court credits this testimony and finds that Equus did not intend to erect or maintain any kind of stadium or bleachers and the matches to be held were to train the polo horses or for charity events.

MacNamara attended informal meetings in the summer of 1991 with Stavropoulos and two other Board members, Patrick Heaney and James Needham. Equus members met with the Board members at the property and showed them exactly what they planned to do. At no time did anyone say that what they were doing was "illegal or wrong or bad for this area." In fact, Stavropoulos "thought it was a very good idea" to the point that he volunteered to give Equus a listing of properties "to which the Town owned development rights as a means of selecting properties." (Tr. at 113).

As soon as Equus filed its application, two of its neighbors hired a lawyer and the Group for the South Fork "launched an incredible campaign against us that lasted for six months." (Tr. at 115). They ran ads, including the "Save It. Don't Pave It." ad, wrote letters, lobbied and "did everything possible to create a furor and to misrepresent what we were doing." (Tr. at 115). Every week the Equus land use situation was in the local papers According to MacNamara, the Group for the South Fork created "a horrible, unpleasant summer." (Tr. at 116). Further, at the Town Board Hearing, the Group for the South Fork rallied people to appear and voice objections and put pressure on the Board to deny the Equus application.

In the summer of 1991, Equus was already operating the property by way of a portable tent with 48 stalls. However, it did not breed horses on the property because it knew it had "run into a problem." So that in the summer of 1991 Trainer Ocampo was running the facility, teaching people to play polo and the grooms to manage polo ponies. Also during that summer, Equus conducted private matches between the 14 members of the Southampton Polo Club. There was no public admission to these matches. The Equus operation on the Tiska property ceased in September 1991 when Justice

Oshrin granted the permanent injunction to the Town. At that time, Equus began looking for a new facility and found temporary quarters consisting of 40 acres in Riverhead at a farm called the Big E.

MacNamara conceded that prior to filing the permit application, Equus expended considerable sums to regrade the property, plant grass, construct paddocks and install water lines. A paddock, as defined by Graev is "merely a plot of ground that is surrounded by a fence" in which horses graze and exercise on their own. Also, the permit application was still pending and undecided in May 1991 when Equus hired Trainer Ocampo, at a salary of $80,000 plus a house and car, brought 48 polo ponies onto the property and held polo matches. Polo was being played on the property three days a week. MacNamara also admitted that teaching the playing of polo was not an "agricultural pursuit." However, he asserted that using and training polo ponies is an agricultural pursuit.

Lawrence Graev is a shareholder and the President of Equus. He is also affiliated with the Southampton Polo Club. In 1991 there were five principals in Equus. In the arrangement between the two entities, Equus leased and managed the real estate and made it available to the polo club members. Prior to the Tiska lease, he discussed the use of the property with the Tiskas and reviewed the Town Code and the Farmland Program. At that time Anthony Tiska was the Chairman of the Town Planning Board. Certain representa-tions were made by Tiska and are expressly set forth in paragraph two of the lease between the Tiskas and the Southampton Polo Club, then assigned to Equus, as follows:

2. The aforesaid lands shall be used for agricultural purposes only consistent with the Agricultural Easement attached hereto and made a part hereof, including, but not limited to, the *keeping, maintaining, raising and training of any and all breeds of horses for polo or otherwise.* The Landlord has no knowl-edge that such intended use is prohibited by any agreements with, or laws, statutes, rules, regulations, orders or judgments of, any governmental authority, including any government, instrumentality, department, commission or board of the State of New York, the County of Suffolk or the Town of South-ampton. [See excerpts from Section 69–9 of the Southampton town Building Code attached hereto and made a part hereof on Schedule B wherein the definitions defined in Section 301 of the New York State Agriculture and Markets Law was amended in the town Code for the *purposes of adding the usage of horseback riding academy and horse stabling facilities to the uses delineated in Section 301* aforementioned as such uses pertain to land from which development rights have been acquired.]

3. The Tenant may install on the subject premises polo and turn-out fields, irrigation facilities, fencing, paddocks, run-in sheds, and bridle paths and access roads providing that no such paths or roads shall be constructed of sand, gravel, or other substances, but only of soil found on the site.

(Pl.Ex. 19)(emphasis added).

The Court notes, however, that there is no express reference to "polo matches" in the lease. Of course, the plaintiff contends that training polo horses would implicitly include polo matches designed to train the horses.

After the Equus permit application was filed on February 28, 1991, and after the first Town Board meeting concerning the application, Graev had conversations with some of the Town Board members. He and others from Equus met with Board member James Needham in March or April 1991 at Needham's home. He advised Needham that Equus would use the facility to raise, breed and train polo and other horses with stabling facilities, and would only play polo three to four months a year. According to Graev, Needham was "very encouraging and was very posi-

tive about our program." Graev met with Needham a second time at the Candy Kitchen in Southampton in the spring of 1991 and had a similar conversation, and Needham had no "change of heart." (Tr. at 193–195).

Graev met with Needham a third time at the Tiska property in July 1991 with all the Equus principals and Town Board member Patrick Heaney. This was after the Farmland Committee and Planning Board reports were filed. A tour of the property was made. At that time, there was a tent and 45 horses on the property. Needham continued to be positive and supportive, while Heaney was less vocal but did not express any negative views.

Graev also spoke with Town Board member Patricia Neumann in June or July 1991 on the front steps of Town Hall. Neumann said, "She was outraged at the way the other members on the Board were dealing with the application, she felt that they were politically motivated, and she thought that we were basically getting a very bad deal with the Town, and she thought it was extremely unfortunate that something so positive for the community was being attacked by various constituents and that some of the Town Board members were reacting against us." (Tr. at 198).

Graev also met with Town Attorney Walsh in March or April 1991, and he agreed "that based on that Code Amendment, we should be able to do what we wanted to do as a matter of right." (Tr. at 199). Asked why Equus started its operations and expended substantial sums of money prior to a decision on the permit application, Graev explained that this was based on advice given to them by their local attorneys, informal discussions with Town Board members and other persons, and the approval by the Farmland Committee.

However, on or about September 5, 1991, Graev had a telephone conversation with Needham, who indicated "that there was a concern among some of the other Board members." Needham asked him whether the Equus plan could be restructured. On September 9, 1991, one day prior to the final meeting, Needham told Graev that "it was too late ... there had been significant political changes in the Town of Southampton since our last telephone conversation ... and that we would probably lose by a three to one vote." Needham further stated that "the Town Board was facing an election year ... that Mr. Stavropoulos in particular was facing a challenge by Fred Thiele ... that ... The Town Board did not want to give Fred Thiele additional political ammunition for the November election and that we were going to lose, that he was sorry that it had to come to this ... and he believed that what we were planning to do was appropriate..." (Tr. at 203–205).

After the permit application was denied, Graev spoke to Town Board member Patricia Neumann who thought their project "was a wonderful way to preserve open spaces in the Town" and "was outraged at the behavior of the other Town Board members" who "were politically motivated and that it was politically expedient for those Town Board members to vote against us in an election year when there was a serious threat from an insurgent group, Southampton party, including Fred Thiele." (Tr. at 206–207). However, it was brought out on cross-examination that Neumann was the only Democrat on the Town Board.

With regard to the plaintiff's equal protection claim, Graev testified that, in his view, there were "similarly situated" facilities on property that is protected by the Farmland Program. First, he referred to David Birdsall, whose family owns a piece of property in Water Mill in Bridgehampton, which property was in the Farmland Program. According to Graev, the Birdsalls sold their development rights to the Town in 1980 and retained barns, horses and equestrian activities on their property. He also "believed" that they train horses

on their property. (See Pl.Ex. 22, the Birdsall Indenture). Second, he referred to Seong Jik Moon's property which was formerly occupied by the Orenstein Brothers. However, Graev's testimony with respect to this property was stricken. (Tr. at 209). In fact, on cross-examination, Graev conceded that he did not know the relationship between Moon and Orenstein, or the kind or number of horses on the Orenstein property. Indeed, Graev stated that he does not have any firsthand knowledge of the Moon property.

The proof revealed that the Moon horse barn was constructed in 1954, prior to the enactment of the Farmland Preservation Act. Also, there was no proof that Moon had a public horse stable or horseback riding on his property. Nor was there any evidence of polo matches on the Moon property. The Court finds that the Moon property is not similarly situated to the Equus–Tiska property at issue.

As to the Birdsall property, Graev conceded, on cross-examination, that Birdsall was a farrier, defined as a person "who makes his living shoeing horses." He also doesn't know how many horses Birdsall keeps on his property or what equestrian activities are conducted there or whether Birdsall ever applied to erect any structure on the property or even whether he operates a farm on the property. In his two visits to the Birdsall property he saw four or five horses, which were not polo ponies, and he never saw any polo matches being conducted.

The Court finds that the Birdsall property is not similarly situated to the Equus–Tiska property at issue in this case. Birdsall did not train polo ponies nor did he conduct polo matches. He did not have 48 horses on his property who were being trained for and participated in polo matches. Birdsall had four or five horses not involved in polo. Also, when Birdsall conveyed his development rights to the Town under the Farmland Program, he expressly reserved his rights to build a horse barn on the property. In fact, Birdsall had horses on his property prior to the conveyance. Also, there was no proof as to whether the horses on Birdsall's property were his or were there to be shod. Of importance for the purpose of this discussion, there was no proof that Birdsall ever engaged in horseback riding, and certainly had no polo matches on his property, nor did he ever intend to do so.

It is significant that in the lease between the Tiskas and the Southampton Polo Club there was no mention about holding "polo matches" on the property. (Tr. at 221). When the lease was executed President Graev knew that Equus would have to go to the Town Board to obtain permission to erect the stables. The lease was entered into on March 12, 1990 and the application for the permit was not filed until February 28, 1991, more than 11 months later. During that period, without obtaining permission to erect the stables, Equus brought 48 horses onto the property; constructed extensive and expensive paddocks and fencing; seeded most of the huge 65 acre piece of property; installed water lines; and hired a professional polo trainer from Argentina at a substantial salary. These somewhat premature acts were done at a substantial expense—in excess of $300,000. All of this effort and money was expended, even though Equus knew that there was a "possibility" that their application would be denied. Equus was pursuing a risky and potentially costly path.

Graev sparred with counsel for the defendants over the meaning of the term "polo match." Graev testified that their polo matches did not involve paying spectators, but were "scrimmages" and not "organized matches." At these polo "scrimmages" the Equus family members would be spectators. Graev conceded that what he defined as a polo match occurred three times a week, on Fridays, Saturdays and Sundays.

Michael G. Walsh was the Town Attorney of Southampton from March 1990 to June 1, 1992. He is familiar with the

plaintiff's application filed on February 28, 1991, the Tiska property and the Farmland Program. After the Equus application was filed it was referred to the Farmland Committee which reported that "a permit should be issued for the construction and uses that were contemplated by the applicant." Walsh did his own review of the statutory scheme and Town Code and issued his first report on April 23, 1991 (Pl.Ex. 3). He concluded that the Farmland Committee had erred and "there was a question as to the legality of the use contemplated by the applicant." He stated that on their property the Tiskas could have kept some horses; and they could breed and train horses. Walsh objected to "the commercial [and] recreational aspect of the application" and the use of the polo club as a commercial enterprise.

Walsh conceded that the application itself was to construct six barns, each with 21 stalls; seven paddocks; fencing for the entire 65 acre area; and parking for 62 cars. The application further stated that "the applicant proposes to stable approximately 124 horses on the premises." This contemplated use was a huge operation. However, also referred to in the application is the "training and stabling of polo ponies—non-commercial uses, to maintain stabling and training facility for polo ponies, area for horse vans—1 acre" and "Petitioner shall from time to time and consistent with the uses allowed under Section 69–24NN(10) zoning ordinance, engage in the playing of polo matches at the subject premises." (Pl.Ex. 1).

Walsh testified that he and the Town Board members were concerned about the use of the site for polo matches, for recreational purposes and for a private polo club. He stated that it was reasonable to assume that to train polo ponies they would have to conduct polo matches. In his first report, Walsh concluded that the use of the property "is inconsistent with the original intent of the Farmland Preservation Program" and therefore the application should be denied. In addition, he proposed an amendment and to the 1981 amendment to the Code because "there was confusion with respect to this particular amendment in 1981 ... as to whether or not the amendment permitted polo clubs or polo uses or recreational uses on preserved farmland in the Town of Southampton." (Tr. at 268–269).

It is Walsh's view that the Town Board denied the Equus application for the following reasons:

THE WITNESS: My opinion is that the Town Board after talking to the Planning Board, myself reviewing the application and sitting at the public hearings, concluded they did not want to permit a private polo club to operate on farmland from which the development rights had been purchased by the citizens of the Town of Southampton and for which taxpayer money had been spent.

THE COURT: So it's the polo matches that was the deciding factor or the polo club, you said?

THE WITNESS: Polo club was a very important issue.

THE COURT: Why would a polo club be objectionable? Because it would have matches?

THE WITNESS: Well, I think there is a more complicated answer than that, Judge. And I think the answer is that if you look at the Farmland's legislation, the purpose of it is to preserve farmland and animal husbandry and farm uses, growing plants, growing animals. The Town Board, I believe, made a determination that that property should not be used for private commercial enterprise or private club, polo club.

Tr. at 272–273.

However, Walsh conceded that the property could be used to raise and sell polo ponies or to have friends come over with their horses and ride together.

Finally, Walsh testified that he rendered his legal opinion in good faith based on his

research of the law and the facts, and it was not based on politics.

Patricia Neumann was a key witness for the plaintiff. She is an attorney and was a member of the Town Board from January 1, 1980 to January 1, 1992. Neumann was aware from the beginning that there would be polo playing in the fields of the Tiska farm. She was of the opinion that such polo playing constituted agricultural production under the Agriculture and Markets Law even though no agricultural product was being produced. She was the only member of the Town Board to vote to approve the Equus application. She did so because "it was completely in keeping with the open space policies of the Town ... as well as the law as it stood at the time" ... and that "agricultural easement purposes could be used for horse riding academies, horse stabling and ... horse raising and riding." (Tr. at 286).

Neumann described the great stress exerted on the Board to deny the application, including newspaper articles, letters, phone calls and the community members at public hearings. She stated that it was "lots of pressure, the most I ever experienced in my twelve years on the Board." (Tr. at 287). The Group for the South Fork was involved in generating the public opposition to the application. She and her fellow Board members discussed this public influence. Neumann characterized the Group's tactics as "demagoguery, scare tactics to rile up the people to take a position to the Town Board members against the application." (Tr. at 290). She stated that the public protests worked and the application was rejected.

Neumann discussed the plaintiff's application with Town Board member Heaney who said it was an "elitist type of activity" and maintained that polo ponies were not the intended use. Also, Walsh told her he believed his task was to find grounds for the Board to deny the permit application. In addition, she heard Stavropoulos tell Walsh to find a way to deny the application. Further, Neumann testified that she heard two members of the Town Board say they were going to vote to deny the application because of pressure exerted on them. Needham said he was voting against it because of the Walsh memorandum.

Neumann was the only Democrat on an all Republican Board. She stated that Peter Boody, the editor of the Southampton Press, constantly wrote editorials against the polo facility and "political candidates in Southampton live or die on the basis of the political opinion of the Southampton Press." Stavropoulos told Neumann that "because of pressure from the Southampton Press he would vote a certain way on this issue." (Tr. at 303–304). However, Neumann conceded that it was not unlawful or illegal for a Town Board member to feel such pressure.

John J. Bennett was Town Attorney of Southampton from 1988 to April 1990. He is familiar with the Farmland Program. Bennett represented Equus from 1990 and throughout the application process. As to the alleged similarly situated properties, Bennett reviewed the Orenstein Brothers Indenture dated July 30, 1982 (Pl.Ex. 21) and the Birdsall Indenture dated August 20, 1982 (Pl.Ex. 22). These two Indentures and the Tiska Indenture (Pl.Ex. 25) were all executed in the early 1980s and contain similar language with regard to the Farmland Program.

As to the Birdsall property, an application for a building permit for a livestock shelter (horse barn) with 17 stalls, dated October 9, 1984 was approved (see Pl.Ex. 26). As to the Orenstein–Moon property, on June 10, 1983, a certificate of occupancy was issued as to structures on the property, including a "one frame horse stable." (Pl.Ex. 26). On May 10, 1991, Bennett wrote to Stavropoulos and the Town Board bringing to their attention the alleged similarly situated Birdsall and Orenstein–Moon properties (Pl.Ex. 27). However, with regard to the Orenstein–Moon property, the barns and horse stable were built

prior to October 1957, but the certificate of occupancy for such structures was not obtained until 1983. Apparently, no building permits were issued to Moon after the date of his Indenture.

The Court finds that these documents fail to establish that the Orenstein–Moon or Birdsall properties and applications were similarly situated to the Equus–Tiska property and application. The Orenstein–Moon property was approved for a one frame horse stable and the Birdsall property for a 17 stall horse barn. Neither property nor application involved the breeding and training of polo ponies and the playing of polo matches. This latter use is altogether different from raising and housing horses, having nothing to do with polo matches.

Randolph V. Aversano is another principal of Equus and is a horseback rider. He is familiar with the Birdsall property. Aversano described the activities occurring in 1990 and 1991 at the Birdsall property. They had a barn in which a number of people occupied space. These people had horses that trained and jumped. He saw this as he would ride by on trail walks with his own horse and with other persons. David Birdsall was the farrier for Aversano and his wife. As a farrier he took care of shoeing all their horses. In addition, his wife rode with Susan Birdsall. Included in the activity on the Birdsall property it "appeared" that they boarded other person's horses. At various times, he saw six to eight horses in the practice ring. Aversano was not sure whose horses were on the Birdsall property. In any event, he saw no polo matches on the Birdsall property. As stated above, the Court finds that, in the context of the facts of this case, the Birdsall property was not similarly situated to the Equus–Tiska property.

In the defendants' case, they produced James J. Needham, who is a CPA and was formerly Chairman of the New York Stock Exchange. He was on the Town Board at the time of the occurrences at issue. After reviewing all the reports and the Town Attorney's opinion, Needham voted against the Equus application. He stated that he considered no political pressure. He said, simply, "I voted the way I did because I was advised by our Town Attorney that that's what the law said." (Tr. at 369). Asked on cross-examination whether he was asked to take account of political considerations such as the impending Supervisor Stavropoulos' election in November 1991, Needham responded, in dramatic fashion, "no one would have dared to have said that to me."

Marietta Seaman is a defendant, was a member of the Town Board in 1991 and is presently the Southampton Town Clerk. As to the Equus application, it was generally known that there would be polo matches held on the Tiska property. Seaman did not consider the holding of polo matches to be an "agricultural" pursuit under the Farmland Preservation Act. Seaman voted to deny the Equus permit application. Prior to her vote she reviewed and considered the reports from the Farmland Committee, the Planning Board and the Town Attorney. She stated that she was "free to vote either way." Seaman testified that she voted against the project "because of the polo matches" which she felt was a recreational rather than an agricultural use.

Seaman denied that the ads against the project or anything that she read influenced her vote. Also, she stated that no one on or off the Town Board asked her to vote in the manner she did and that politics did not motivate her vote. However, Seaman was aware that the Farmland Committee reported that the Equus application was approvable and she conceded that it was acceptable to breed, raise and train polo ponies on the Tiska property. She also admitted that the erection of a stadium was not part of the Equus application. Her concern was the polo matches where spectators were invited to attend and pay a fee to watch, which she felt would be an unacceptable use.

Plaintiff's counsel conceded that Equus was going to use the Tiska property to breed, raise, train and sell polo ponies. Also, they would have "polo games to teach horses how to be polo horses," but they would not build or maintain a polo stadium.

## III. CONCLUSIONS

### A. As to the Section 1983—Equal Protection Claim

Equus contends that its right to equal protection was violated by "the selective enforcement of the municipal and local law and rules against the plaintiff by the defendants." (Pl.'s Memo. in Opp. at 10–11). A violation of equal protection by selective enforcement arises if:

> (1) the person, compared with others similarly situated, was selectively treated; and (2) . . . such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Crowley v. Courville*, 76 F.3d 47, 52–53 (2d Cir.1996); *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir.1995); *LaTrieste Restaurant & Cabaret Inc. v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609–10 [2d Cir.1980], *cert. denied*, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 [1981] ).

■ As to the first element of an equal protection cause of action, the plaintiff must prove, by a preponderance of the evidence, that it was similarly situated to other landowners or lessees in the town but was nevertheless treated differently. The best explanation for determining whether other persons are "similarly situated" was set forth in *The Dartmouth Review v. Dartmouth College*, 889 F.2d 13 (1st Cir.1989), and previously cited by this Court in *Kirschner v. Zoning Board of Appeals of Valley Stream*, 924 F.Supp. 385, 391 (E.D.N.Y.1996), as follows:

> The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as in the lawyer's art of distinguishing cases, the "relevant aspects" are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely or necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.

*Dartmouth Review*, 889 F.2d at 19; *See also Carey v. Mt. Desert Island Hosp.*, 156 F.3d 31 (1st Cir.1998) (quoting *Molloy v. Blanchard*, 115 F.3d 86, 91 [1st Cir.1997] [quoting, in turn, *Dartmouth Review* ] ).

■ In this case, the only other parcels of land claimed by Equus to be similarly situated to it are the Birdsall and Orenstein–Moon properties. The Court finds that the plaintiff failed to prove, by a preponderance of the evidence, that, in the equal protection context, either parcel was similarly situated to the Equus property. First, the overriding objection by the Town Board to the Equus application, justified or unjustified, was the polo matches that concededly took place, three days a week, on the Tiska property. The objection was not to the breeding of horses; it was to the polo playing. There was no breeding of polo ponies, polo playing or polo matches at either the Birdsall or the Orenstein–Moon properties.

As to the Birdsall property, the right to build a horse barn was expressly reserved to Birdsall in his original Farmland Program Indenture. Also, the evidence revealed that, on occasion, six or eight horses were seen on the property. However, since Birdsall was a farrier, it was not established whether the horses on the property were his horses or were other person's horses there to be shod. In addition, there was evidence adduced that people on the Birdsall property would be jumping and training horses within that facility. However, there were no polo po-

nies trained and no polo matches held on the Birdsall property.

With regard to the Orenstein–Moon property, the evidence revealed that the horse barn was constructed in 1954, long before the Farmland Preservation Act was enacted. There was no evidence introduced that Moon had a public horse stable, was involved in horseback riding or conducted polo matches on his property.

Based on the evidence presented, and in fact, the lack of evidence, the Court finds that a prudent person, looking objectively at the three properties, would not find them roughly equivalent or similarly situated. The thrust of the Equus plan was polo playing and conducting polo matches, activities totally absent at the other two properties. The "relevant aspect" to weigh the similarities is polo playing and polo matches, not housing or training horses. Comparing these respective properties would be contrasting "apples with oranges." Accordingly, the plaintiff having failed to prove the first prong of a Section 1983 equal protection cause of action, namely, the persons compared must be similarly situated, the plaintiff's Section 1983 equal protection cause of action is dismissed.

## B. *The Plaintiff's Motion to Amend*

During the trial, the plaintiff moved to amend the complaint to "resurrect" its Section 1983 substantive due process claim and for the Court to exercise its supplemental jurisdiction power to compel the Town to issue a permit. As stated above, the permit has been issued and the latter part of the motion is denied as moot. The Section 1983 substantive due process claim was previously dismissed by the Court in its August 27, 1997 ruling. This oral motion to amend was supported by a written motion dated June 15, 1998. This motion was precipitated by the Appellate Division decision of August 8, 1994 which directed that the Town grant the Equus application and remitted the matter to the Town Board "for the imposition of any appropri-

ate conditions." The plaintiff complains that the Town has delayed unnecessarily and imposed unreasonable conditions. The plaintiff's motion requested the following relief: "(i) pursuant to 28 U.S.C. § 1367, to exercise supplemental jurisdiction over the State law issues herein; (ii) pursuant to Rule 15(a) of the Federal Rules of Civil Procedure ("F.R.C.P.") for an order permitting plaintiff to amend the complaint to include a cause of action for a mandatory injunction; and (iii) pursuant to F.R.C.P. Rule 15(d), for an order permitting plaintiff to supplement the complaint due to defendants' continued failure to issue a permit to plaintiff."

With regard to the Town's delay in issuing the permit, it produced Deputy Town Attorney Wayne Bruyn, who explained after the 1994 Appellate Division decision, the Town held a public hearing and on August 18, 1995 adopted resolutions issuing the construction permit with six stated conditions. One of the conditions required a new site plan. Bruyn stated that the plaintiff did not submit a site plan for two years until the Fall of 1997. Another condition is that all structures subject to this construction permit must obtain building permits. These applications were not made by the plaintiff until the Fall of 1997.

In September, 1997, a representative of Equus appeared before the Town Board with a sketch showing the leased premises to be 43 acres rather than the original 65 acre area. Because this was a new plan, the Planning Board made certain comments, after which the plaintiff submitted a more detailed plan showing structures including fences, sheds and plastic shelters. Apparently, the site plan submitted by Equus on April 3, 1998. The Town Board met on May 15, 1998 and requested the Planning Board to review this new application. The Town Board approved the site plan by resolution dated June 8, 1998, and issued the permits with certain conditions on June 19, 1998.

The Federal Rules of Civil Procedure provide that "leave [to amend a pleading] shall be freely given when justice so requires." Fed.R.Civ.P. 15(a); *see also Nerney v. Valente & Sons Repair Shop*, 66 F.3d 25 (2d Cir.1995); *Gumer v. Shearson, Hammill & Co.*, 516 F.2d 283, 287 (2d Cir.1974). According to the Supreme Court, only "undue delay, bad faith, or dilatory motive on the part of the movant repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party ... [or] futility of the amendment" will serve to prevent an amendment prior to trial. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *accord Dluhos v. Floating and Abandoned Vessel Known as New York*, 162 F.3d 63, 69 (2d Cir.1998)*Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 653 n. 6 (2d Cir.1987).

The Second Circuit reiterated that "[t]he district court has discretion whether or not to grant leave to amend, and its discretion is not subject to review on appeal except for abuse of discretion." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir.1993) (quoting 3 *Moore's Federal Practice* ¶ 15.08[4], at 15–16 (2d ed.1992) (footnotes omitted)); *see also Jones v. N.Y. State Div. of Mil. and Naval Affairs*, 166 F.3d 45 (2d Cir.1999); *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir.1990). "In exercising its discretion, the district court is required to heed the command of Rule 15(a) to grant leave to amend 'freely ... when justice so requires.'" *Ruffolo*, 987 F.2d at 131 (quoting Fed.R.Civ.P. 15(a)).

■ As the Court determined in its original decision dismissing the Section 1983 substantive due process claim, "Substantive due process protects against government action that is arbitrary, conscience shocking, or oppressive in a constitutional sense, but not against a government action that is 'incorrect or ill-advised.'" *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir.1995)

(quoting *Lowrance v. Achtyl*, 20 F.3d 529, 538 [2d Cir.1994]). When considering this issue, the federal courts should be careful not to evolve into zoning boards of appeal to review nonconstitutional issues of land use determinations by local administrative agencies. *Sullivan v. Town of Salem*, 805 F.2d 81, 82 (2d Cir.1986). The rule as was clearly stated by the Second Circuit in *Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 144 (2d Cir.1994):

The due process clause "was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.'" *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (quoting *Davidson v. Cannon*, 474 U.S. 344, 348, 106 S.Ct. 668, 88 L.Ed.2d 677 ([1986]) ... The Supreme Court has warned, however, that is "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992). The due process clause "is not a guarantee against incorrect or ill-advised [government] decisions." *Bishop v. Wood*, 426 U.S. 341, 350, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

A substantive due process claim based on allegedly tortious conduct by a state actor therefore ordinarily requires evidence of conduct that "can properly be characterized as arbitrary, or conscience-shocking, in a constitutional sense." (Citations omitted)

In this case, if, after the Appellate Division decision, Equus promptly followed through on its original plan with regard to the 65 acres, and the Town continued to obstruct the granting of the permit by imposing unreasonable or onerous conditions, the Court would have seriously considered granting the motion to add a substantive due process cause of action.

However, here, the plaintiff did nothing to implement its victory in the Appellate Division for three years. Further, when it acted, it presented a new and revised plan to the Town Board. The Court is not naive enough to believe that the Town did not seize upon this opportunity to further obstruct and delay the plaintiff. Unfortunately, by its lengthy delay and submission of a new plan, the plaintiff presented the Town with the opportunity to start the process over again. This factual scenario could not support a conscience shocking or oppressive substantive due process constitutional violation. Accordingly, the plaintiff's application to amend the complaint to add a Section 1983 substantive due process cause of action is denied.

## C. *The Plaintiff's Motion for the Court to Accept the State Law Claims Under its Supplemental Jurisdiction Power*

The plaintiff also moved to exercise supplemental jurisdiction over the state law issues, including a request for a mandatory injunction directing the Town Board to issue a permit. As stated above, because the permit has been issued, this motion is denied as moot. However, even if the mootness issue was not present, the Court would deny this motion. In this opinion, the Court has already dismissed the plaintiff's federal Section 1983 claim, and would decline to exercise its supplemental jurisdiction over any remaining or potential state law claims. *See In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F.3d 56, 61 (2d Cir.1998) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 [1966] ). A district court may decline to exercise supplemental jurisdiction if it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

Although this Court has the *power* to exercise supplemental jurisdiction over the ensuing potential state law claims notwithstanding the absence of a federal law issue, *Mizuna, Ltd. v. Crossland Federal Svgs. Bank,* 90 F.3d 650, 657, (2d Cir.1996); *Promisel v. First Am. Artificial Flowers, Inc.,* 943 F.2d 251, 254 (2d Cir.1991) *cert. denied,* 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992), the Court would decline to do so in this case. The issues of compliance with a state appellate court decision; the reasonableness of the conditions imposed; whether the Town Board has deliberately violated the appellate court ruling; and the remedies available to Equus, are all matters peculiarly within the province of the available state forum. Also, the evidence at the trial would not permit the Court to make such rulings, possibly requiring another trial, which could more conveniently be held in a state forum. Finally, considering and weighing the values of judicial economy, convenience, fairness and comity, (*United Mine Workers v. Gibbs,* 383 U.S. at 726–727, 86 S.Ct. 1130), the Court would decline to exercise supplemental jurisdiction with regard to the plaintiff's state law claims.

Accordingly, for the reasons stated, the Court directs the Clerk of the Court to enter a judgment in favor of all the defendants dismissing the complaint in its entirety and to close this case.

SO ORDERED.