**ECONOMIC OPPORTUNITY COMMISSION OF NASSAU COUNTY, INC., CEDC, Incorporated, and John L. Kearse, Plaintiff,**

v.

**The COUNTY OF NASSAU, INCORPORATED, Village of Hempstead, Incorporated, Village of Hempstead Community Development Agency, Clinton C. Boone, Tina Hodge–Bowles, John Courtney, James A. Garner, Alvina Gray, Glen Spiritis, Charles Theofan, Thomas S. Gulotta, Owen B. Walsh, Kenneth Cynar, Joseph W. Ryan, Jr., Harrison J. Edwards and Donald J. Campbell, Defendants.**

**No. CV97–6104 (ADS).**

United States District Court,
E.D. New York.

May 3, 1999.

Law Offices of Frederick K. Brewington, Hempstead, NY, by Frederick K. Brewington, of counsel, for the plaintiffs.

Snitow & Cunningham, LLP, New York City, by Stewart J. Epstein, Robert P. Devlin, Charles D. Cunningham, Edward J. Phillips, of counsel, for the Nassau County, defendants.

Horowitz & Feinberg, West Hempstead, NY, by Saul Horowitz, Matthew Feinberg, of counsel, for the defendant Incorporated Village of Hempstead.

Certilman Balin Adler & Hyman, LLP, East Meadow, NY, by Brian J. Davis, of counsel, for the Incorporated Village of Hempstead Community Development Agency, defendants.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This lawsuit arises from the claims of the plaintiffs, including the Economic Opportunity Commission of Nassau County, Inc. ("EOC"), a self-described "official antipoverty community action agency for Nassau County," that the defendants, consisting of local municipalities, agencies and officials, conspired, among other things, to unlawfully deprive it of a multi-million dollar loan guarantee by the United States Department of Housing and Urban Development ("HUD"), so as to obtain control of the plaintiffs' coveted properties. The Complaint raises claims of due process and equal protection under 42 U.S.C. § 1983; conspiracy and substantive violations under the Racketeer and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d); and several common law causes of action. At issue are three, separately-filed motions to dismiss the Amended Complaint (the "Complaint"), pursuant to Federal Rule of Civil Procedure 12(b)(6), by the Village of Hempstead defendants (the "Village"), the Nassau County defendants (the "County"), and the defendant Incorporated Village of Hempstead Community Development Agency (the "CDA"). The County also moves to dismiss pursuant to Rule 9(b).

### I. BACKGROUND

The following facts are derived from the Complaint.

#### A. The Parties

##### 1. *The Plaintiffs*

The plaintiff Economic Opportunity Commission of Nassau County, Inc. ("EOC") is a private, nonprofit corporation which serves as the "official anti-poverty community action agency for Nassau County," New York. The plaintiff CEDC, Incorporated ("CEDC"), also a private, nonprofit corporation, serves as the "eco-

nomic development arm" of the EOC and administers certain community development programs in the County. The plaintiff John L. Kearse ("Kearse") serves as the Chief Executive Officer of both the EOC and the CEDC.

Kearse is a long-time community activist who states that he "was a motivating force behind the recent successful federal court constitutional challenge to the composition of [the] County's governing body." His political activities have contributed to the "creation of [the] current County Legislature, which has served to enhance the political influence of the minority community," albeit, allegedly at the expense of the "controlling political establishment" in the County, which opposed Kearse's efforts "with vigor."

The EOC owns and occupies two properties. The first property is a building, which the plaintiffs renovated, located at 134 Jackson Street, in Hempstead, Nassau County (the "Jackson Street building"). The Jackson Street building "serves as a primary example of the recent revitalization effort" the plaintiffs have conducted in a "previously dilapidated area" of the Village.

In 1977, CEDC purchased the second property, the Hempstead Bus Terminal Building, located at 100 Main Street in Hempstead, Nassau County (the "Bus Terminal" and, collectively with the Jackson Avenue building as "the Properties") for the purpose of providing "a consistent income base" for the plaintiff agencies and "as a symbol of the ability of the minority, low-income committee to become economically self-sufficient."

Several years later, in or about May 1993, CEDC undertook major renovations at the Bus Terminal. The work was financed through a program adopted as part of the Housing and Urban Development Act of 1974, codified at 42 U.S.C. § 5308, and commonly referred to as a "Section 108 loan guarantee." The Section 108 loan guarantee was issued to Nassau County, as recipient, and the Village of Hempstead,

as sub-recipient, for the purpose of eventually channeling the funds to the EOC and the CEDC. Under this arrangement, the Village, through its Community Development Agency (the "CDA"), loaned 6.25 million to the CEDC, of which approximately $2 million was used to satisfy an existing mortgage on the property. The balance of the funds were allocated for renovations. The loan was secured by a $6 million first mortgage, with the CDA as the mortgagee.

### 2. The Defendants
#### a. The CDA Defendants

The CDA is empowered to design and implement urban renewal projects in the Village. Many of the defendants in this case are CDA officials who are sued in their individual and official capacities: Clinton C. Boone ("Boone") is the Vice-Chairman of the CDA and a member of the Board of Directors; Tina Hodge–Bowles ("Hodge–Bowles") is the Secretary of the CDA and a member of the Board of Directors; John Courtney ("Courtney") is the Treasurer of the CDA and a member of the Board of Directors; James Dunne ("Dunne") is a member of the CDA's Board of Directors; Alvina Gray ("Gray") is the Deputy Commissioner of the CDA and a member of the Board of Directors; Glen Spiritis ("Spiritis") is the Commissioner of the CDA; Charles Theofan ("Theofan") is the Assistant Commissioner for Legal Affairs of the CDA; Anne Martin ("Martin") is a member of the CDA's Board of Directors; and James A. Garner ("Garner"), is the Village Mayor and the Chairman of CDA's Board of Directors (collectively, the "CDA defendants").

#### b. The Nassau County Defendants

The Nassau County defendants, who also are sued in their individual and official capacities, include the following: Thomas S. Gulotta ("Gulotta") is the Nassau County Executive; Owen B. Walsh ("Walsh") is the Nassau County Attorney; Kenneth Cynar ("Cynar") is the Special Assistant to the County Executive; Joseph W. Ryan,

Jr. ("Ryan") serves as Special Counsel to the County Attorney; Harrison J. Edwards ("Edwards") is the Special Counsel to the Nassau County Department of Housing and Intergovernmental Affairs; and Donald J. Campbell ("Campbell") is the Commissioner of the Nassau County Office of Housing and Intergovernmental Affairs (collectively, the "County defendants").

### B. The Defendants' Alleged Efforts to Control the Bus Terminal

As noted previously, in 1993, CEDC undertook major renovations needed at the Bus Terminal. However, by the plaintiffs' account, the CDA threw up roadblocks at every turn. For example, the CDA insisted that the contract for a general contractor to perform the work be put out for a public bid, rather than permit the CEDC to perform the work itself. Then, when the CEDC submitted the lowest bid to serve as the general contractor, the CDA nevertheless demanded that the contract be awarded to the next lowest bidder, Viron Company, Inc. ("Viron").

At the encouragement of Mayor Garner and CDA Commissioner Spiritis, Viron subcontracted with another company, QDR Consultants and Development Co. ("QDR"), for a $1.3 million part of the work. "The result was a disaster," the plaintiffs maintain. QDR did not complete the work it designated for itself, and did not pay its own subcontractors. When Kearse tried to terminate QDR, the CDA and Village officials "threatened" him, saying that "any action taken to terminate the [QDR] contract would result in CDA not releasing any further funds to the project."

As a result of Viron's failure to complete the project in a timely or competent manner, CEDC was unable to generate sufficient rental income from the Bus Terminal to satisfy its real estate tax and mortgage obligations for the property. As of 1995, CEDC was unable to lease more than 30% of the projected available office space in the Property due to the "massive construc-

tion problems" that resulted in "burdensome construction delays and thwarted completion." According to the plaintiffs, officials from the Village and the CDA conspired to cause these delays and cost overruns in an effort to "divest CEDC of its real property, to discredit and defame Plaintiffs for controversial political activities, and to improperly subvert and discontinue funding for EOC."

The Complaint further alleges that the CEDC's efforts to increase the rent roll at the Property were "inhibited by Defendants' actions to discourage public agencies from leasing available space in the building," despite the pressing need for office space in the Village, and the Bus Terminal's convenient location at the "heart of the District Court area." In this regard, the plaintiffs state that the County canceled a bidding process to house the Bureau of Traffic Violations "after it became apparent that CEDC was ready to submit the lowest bid and win the contract to house the agency." Also, the CDA and the Village "selectively and discriminatorily chose to preclude CEDC from leasing property" to a methadone clinic, despite the fact that existing zoning regulations would have permitted the lease. The actions of the County, the CDA and the Village resulted in the plaintiffs allegedly losing "at least $100,000" each year in rental income.

### C. The Failed Effort to Gain Section 108 Refinancing

In 1994, CEDC communicated with officials at HUD and learned that Section 108 funds might be made available to restructure the mortgage and make additional funds available for the rehabilitation of the Bus Terminal.

In February 1994, the defendant Cynar, the Special Assistant to the County Executive, entered into a "verbal agreement with Plaintiffs," promising that the County would complete HUD refinancing of the Bus Terminal "expeditiously and without

undue delay." Contrary to this agreement, the County delayed refinancing "for a substantial period of time," thereby pushing the plaintiffs further into debt.

More than a year later, in September 1995, Nassau County submitted an application to HUD requesting a $10 million Section 108 loan guarantee on the CEDC's behalf. In May 1996, HUD approved an $8 million loan guarantee, and gave the County a 6 month window to execute the agreement for the restructuring. In a subsequent letter dated January 22, 1997, from HUD to Campbell, the Commissioner of the Nassau County Office of Housing and Intergovernmental Affairs, HUD reiterated its desire to proceed with the contemplated refinancing and requested that the County refrain from asserting its tax lien on the Bus Terminal. In addition, the HUD letter served notice that an additional $2 million dollars was available to increase the refinance package.

During the 6–month window, the plaintiffs and the County negotiated, unsuccessfully, regarding the refinancing agreement. During that time, the County continuously promised it would expeditiously finalize the restructure agreement and that the CEDC would soon receive the federally guaranteed loans. The County also agreed that it would forbear delivery of a tax deed and foreclosure of the mortgage, which would divest CEDC of ownership of the properties, in light of the oral agreement to refinance. However, the County never executed the agreement for the restructuring.

According to the plaintiffs, the County needlessly prolonged the fruitless negotiations, under the guise of seeking stricter financial controls over the CEDC's operations, in order to drive the CEDC further into debt and ultimately seize control of the valuable Bus Terminal by issuing a tax deed. The County required the CEDC to accept numerous rigorous conditions, that had not been part of the HUD proposal, such as demanding that the CDA be a party to the transaction, application or approval, and that the CEDC consent to the Village holding increased financial control over the property.

Also towards this end, the County initiated an investigation by the defendant Ryan, Special Counsel to the County Attorney, to study the CEDC's operations and the proposed refinancing. On May 20, 1997, Ryan issued a report recommending that the refinancing be completed under certain conditions, including the appointment of an independent comptroller. On or about July 22, 1997, the CDA served the CEDC in a foreclosure lawsuit with regard to the Bus Terminal Property. Approximately a week later, on July 31, 1997, Ryan issued an amended report recommending that the County terminate its refinancing negotiations with the CEDC due to irreconcilable differences between the parties. The County followed Ryan's recommendation, and filed a tax deed against the property, which is currently in the County's ownership and possession.

The plaintiffs contend that the defendants have attempted "to cripple the operational ability" of the EOC and the CEDC, in that the defendants are "well aware that foreclosure proceedings against the [Bus Terminal] will likely result in a deficiency judgment, rendering the 134 Jackson Street property vulnerable to creditors."

### D. The Social Services Agreement

The CEDC's activities have been funded, in part, through successive agreements with the Nassau County Department of Social Services (the "DSS Agreement"). Most recently, the County and the EOC entered into a written DSS Agreement dated January 17, 1997, and amended July 3, 1997, in which the County agreed to provide $1,766,720 to the EOC to cover administrative expenses, including legal fees. This DSS Agreement is a successor agreement to a similar 1996 agreement between the County and the EOC. The 1997 DSS Agreement requires that the County reimburse the EOC for expenses related to administrative functions, and further provides that the EOC may transfer or exchange funds between specific

administrative budget items as long as the overall cost does not exceed the maximum contract amount. Under the DSS Agreement, the EOC must submit vouchers to the County for reimbursement of expenses incurred as a result of the administrative functions covered.

The Complaint alleges that as of September 6, 1997, the County violated the DSS Agreement by failing to reimburse the EOC for $131,235.67 that it expended on legal fees which were reimbursable under the Agreement.

### E. Procedural History of this Case

The plaintiffs commenced this action on or about October 23, 1997, by serving a summons and complaint alleging due process and equal protection claims under Section 1983, RICO claims, and various state common law claims.

On April 13, 1998, United States Magistrate Judge Michael L. Orenstein directed the plaintiffs to file a RICO case statement, and a motion to amend their complaint, apparently after some discussion as to the viability of RICO claims against the municipal defendants.

After a series of conferences before Magistrate Judge Orenstein, and several interim proceedings, the plaintiffs filed the Amended Complaint at issue, which redacted allegations that the County and the Village were part of a RICO association-in-fact enterprise, and removed the municipalities as RICO defendants.

### F. The Claims Raised in the Complaint

The claims raised in the Complaint are listed below, with numbers corresponding to those designated in the Complaint.

**1. § 1983: Due Process/Takings Clause Claim and Equal Protection Claim Against All the Defendants**

a. *As Against All of the Individual Defendants*

The Complaint alleges that all of the individual defendants conspired to violate the plaintiffs' constitutional rights to due process and equal protection by: (1) wrongfully taking, without just compensation, the properties at issue; (2) interfering with the plaintiffs' right to receive approved Section 108 loan guarantees; (3) maliciously interfering with the plaintiffs' right to manage and control their property; and (4) violating the express terms of the social services agreement between the EOC and the County by refusing to reimburse EOC for legal fees that it incurred and continues to incur as a result of the defendants' allegedly wrongful conduct.

b. *As Against the Village, the County and the CDA*

The Complaint alleges that these defendants, acting through municipal officers at the insistence of final policymakers, and as the result of an unannounced municipal policy to acquire valuable property in urban renewal areas, knowingly and purposefully conspired to violate the plaintiffs' due process and equal protection rights by: (1) wrongfully and illegally taking, without just compensation, the properties at issue; (2) interfering with the plaintiffs' right to receive approved Section 108 loan guarantees; (3) maliciously interfering with the plaintiffs' right to manage and control their property; and (4) violating the express terms of the social services agreement between the EOC and the County by refusing to reimburse EOC for legal fees that it incurred and continues to incur as a result of the defendants' allegedly wrongful conduct.

c. *As Against the CDA Commissioner Spiritis, the Village and the CDA*

The Complaint states that these defendants, acting through final policy makers and pursuant to the CDA's unannounced policy of improperly asserting control over private properties in the Village, violated the plaintiffs' due process and equal protection rights by "circumventing the legally agreed upon bidding procedures so as to

ensure that contractors subject to their influence and control would be hired," thereby undermining the plaintiffs' abilities to meet their mortgage or tax payments.

### 2. Section 1983/*Monell* Claim Against All the Defendants

Raising the same allegations set forth in the First Cause of Action, the plaintiff alleges that those acts "are and constitute official acts and policies of the municipal entities which are defendants herein."

3. Substantive RICO Claim Under Section 1962(c) Against the CDA and the Individual CDA Defendants

4. RICO Conspiracy Claim Under Section 1962(d) Against the CDA and All the Individual Defendants

5. Intentional Interference With Prospective Economic Advantage Against the County, the Village and the CDA

6. Judgment "Canceling and Discharging, in its Entirety, ... CEDC's Indebtedness to CDA with Respect to the Property, Including its Debt for Village Taxes Assessed with Respect to Said Property, and Canceling of Record the Mortgage Securing Said Indebtedness"

7. Declaratory Judgment in favor of the Plaintiffs and against the Defendants: (1) in each of the previous six causes of action; (2) enjoining the defendants from taking any further action to foreclose on the property; (3) canceling and discharging, in its entirety, CEDC's indebtedness to CDA with respect to the Property; (4) vacating the tax deed; and (5) restoring the title to the Property to CEDC

## II. DISCUSSION

As stated at the outset, the Court must resolve three, separately-filed motions to dismiss the Complaint: the Village's Rule 12(b)(6) motion; the County defendants'

motion under Rules 12(b)(6) and 9(b); and the CDA defendants' Rule 12(b)(6) motion.

### A. The Legal Standards

#### 1. *Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim*

On a motion to dismiss for failure to state a claim, the Court should dismiss the complaint pursuant to Rule 12(b)(6) if it appears beyond doubt that the plaintiffs can prove no set of facts in support of their complaint which would entitle them to relief. *Morris v. Local 819*, 169 F.3d 782 (2d Cir.1999) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 [1957] ). It is not the Court's function to weigh the evidence that might be presented at a trial; instead, the Court must merely determine whether the complaint is legally sufficient. *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985). Thus, the Court must accept the allegations of the complaint as true, and construe all reasonable inferences in favor of the plaintiffs. *Koppel v. 4987 Corp.*, 167 F.3d 125, 127 (2d Cir.1999); *Connell v. Signoracci*, 153 F.3d 74 (2d Cir.1998); *LaBounty v. Adler*, 933 F.2d 121, 123 (2d Cir.1991).

#### 2. *Rule 9(b)*

Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R.Civ.P. 9(b). *See also Plount v. American Home Assurance Co., Inc.*, 668 F.Supp. 204, 206 (S.D.N.Y.1987) (holding that the concerns that require fraud to be pleaded with particularity are even more urgent in a civil RICO action). The Second Circuit has held that allegations of mail and wire fraud, when pled as RICO predicate acts, must satisfy Rule 9(b). *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir.1993). To comply with Rule 9(b), a Complaint "must adequately specify statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the state-

ments were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *McLaughlin v. Anderson,* 962 F.2d 187, 191 (2d Cir.1992) (quoting *Cosmas v. Hassett,* 886 F.2d 8, 11 [2d Cir. 1989] ). Where multiple defendants are involved, the complaint is required to describe specifically each defendant's alleged participation in the fraud. *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987).

With these standards in mind, the Court will assess each of the defendants' arguments as applied to the plaintiffs' claims.

### B. The RICO Claim

The Complaint raises two RICO causes of action: (1) a substantive RICO Claim Under Section 1962(c); and (2) a RICO Conspiracy Claim Under Section 1962(d). The defendants launch a multi-faceted attack on the RICO claims, arguing that the plaintiffs fail to plead: (1) predicate acts; (2) a pattern of racketeering activity; (3) scienter; (4) that the defendants directed a criminal enterprise; and (5) facts from which to infer a conspiracy In addition, the CDA, its municipal board members and its employees, argue that they are not subject to a RICO claim as a matter of law.

### 1. *The Elements of a RICO Claim*

█ The threshold pleading requirements of a private action under RICO, Section 1962 were set forth by the Second Circuit in *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied sub nom. Moss v. Newman,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984), as follows:

> To state a claim for damages under RICO a plaintiff has two pleading burdens. First, he must allege that the defendant has violated the substantive RICO statute, 18 U.S.C. § 1962 (1976), commonly known as "criminal RICO." In so doing, he must allege the existence of seven constituent elements: (1) that the defendant (2) through the commis-

sion of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce.... Plaintiff must allege adequately defendant's violation of section 1962 before turning to the second burden—*i.e.,* invoking RICO's civil remedies of treble damages, attorneys fees and costs.... To satisfy this latter burden, plaintiff must allege that he was "injured in his business or property by reason of a violation of section 1962." (citations omitted).

*See also Pinnacle Consultants v. Leucadia Nat'l Corp.,* 101 F.3d 900, 904 (2d Cir.1996) (discussing the standards). Section 1962 prohibits, under subsections (a) through (d), the following: (a) the use of income "derived ... from a pattern of racketeering activity" to acquire an interest in, establish, or operate an enterprise engaged in or whose activities affect interstate commerce; (b) the acquisition of any interest in or control of such an enterprise "through a pattern or racketeering activity"; (c) the conduct or participation in the conduct of such an enterprise's affairs "through a pattern of racketeering activity"; and (d) conspiring to do any of the above. 18 U.S.C. §§ 1962(a)–(d); *see also GICC Capital Corp. v. Technology Finance Group, Inc.,* 67 F.3d 463, 465 (2d Cir.1995), *cert. denied,* 518 U.S. 1017, 116 S.Ct. 2547, 135 L.Ed.2d 1067 (1996). Here, the complaint alleges a substantive RICO violation under Section 1962(c), and a conspiracy claim under Section 1962(d). The existence of a "pattern of racketeering activity" is a requirement under both prongs.

█ To establish such a pattern, "a plaintiff must plead at least two predicate acts, show that the acts are related and that they amount to, or pose a threat of, continuing criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195

(1989). RICO is aimed at "racketeering activity," which the statute defines, in relevant part, as certain acts indictable under Federal law, including mail and wire fraud, and violations of the Hobbs Act. 18 U.S.C. § 1961(1)(B).

## 2. *Pattern of Racketeering Activity*

A "pattern" requires at least two acts of "racketeering activity", occurring within ten years of each other. *See* 18 U.S.C. § 1961(5). To reiterate, the term "racketeering activity" refers to the predicate acts necessary to sustain a RICO claim and include mail fraud, wire fraud, and the Hobbs Act. *See* 18 U.S.C. § 1961(1). Those predicate acts must be crimes under state or federal law. *United States v. Angelilli,* 660 F.2d 23 (2d Cir.1981), *cert. denied,* 455 U.S. 945, 102 S.Ct. 1442, 71 L.Ed.2d 657, *rehearing denied,* 456 U.S. 939, 102 S.Ct. 1998, 72 L.Ed.2d 460 (1982); *Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 995 (E.D.N.Y.1995).

▆▆▆▆ Both the Supreme Court and Second Circuit have held that an allegation of two acts of "racketeering activity", without more, is not sufficient to establish a pattern. *See H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. at 238–44, 109 S.Ct. 2893; *United States v. Indelicato,* 865 F.2d 1370, 1381 (2d Cir.) (en banc), *cert. denied,* 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989). To constitute a "pattern" of racketeering activity, the predicate acts must be related and constitute a threat of continued racketeering activity and this determination is to be made on a case-by-case basis. *H.J. Inc.,* 492 U.S. at 238–44, 109 S.Ct. 2893; *see also United States v. Alkins,* 925 F.2d 541, 551 (2d Cir.1991) (predicate acts must be related and amount to or pose a threat of continued criminal activity). In addressing the determination about a "pattern" of racketeering activity the Second Circuit noted that "[a]n interrelationship between acts, suggesting the existence of a pattern, may be established ... [by] proof of their temporal proximity, or common goals, or similarity of methods, or repetitions." *Indelicato,* 865 F.2d at 1382.

The Court will first address the predicate acts alleged by the plaintiffs, and then determine whether those acts properly plead a pattern.

The plaintiffs allege, in the Amended Complaint, as supplemented by their RICO Case Statement, that a facsimile and several telephone calls constituted wire fraud; that certain letters constituted mail fraud, and that the CDA defendants committed an act of extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, stemming from their forcing the plaintiffs to accept and employ Viron.

### a. *Mail Fraud*

The mail fraud statute, 18 U.S.C. § 1341, provides, in relevant part, that a person is guilty of mail fraud if:

> having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, [the person] places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service.

▆▆▆ The crux of mail fraud and wire fraud is "an intent to defraud." *United States v. Bouyea,* 152 F.3d 192, 194 (2d Cir.1998); *U.S. v. Gabriel,* 125 F.3d 89, 96 (2d Cir.1997). To establish an intent to defraud, the plaintiffs must adequately allege that the "defendants contemplated some actual harm or injury to their victims. Only a showing of intended harm will satisfy the element of fraudulent intent." *United States v. Dinome,* 86 F.3d 277, 283 (2d Cir.1996) (mail fraud and wire fraud) (quoting *United States v. Starr,* 816 F.2d 94, 98 [2d Cir.1987] ); *see also In re Registry Publishing,* 68 F.3d at 580 ("In order to establish that the defendant acted with an intent to defraud, the Government

must show that some actual harm or injury was contemplated by the schemer.") (internal quotation marks omitted); *United States v. D'Amato,* 39 F.3d 1249, 1257 (2d Cir.1994).

■ With respect to the alleged mail fraud, the RICO Case Statement alleges that several mailings constitute predicate acts of mail fraud.

The letters may be summarized as follows:

(1) Letter, dated January 5, 1994, from *the plaintiff* CEDC to CYNAR stating that CEDC would pay its real estate taxes when the funds became available.

(2) Letter, dated February 18, 1994, from defendant Campbell to defendant Spiritis stating that the Nassau County Office of Housing and Intergovernmental Affairs ("OHIA") had received the necessary paperwork from HUD for the Section 108 application.

(3) Letter, dated December 7, 1994, from defendant Spirits to plaintiff Kearse regarding CEDC's request for additional funds from the County for the Bus Terminal renovation project, in which Spiritis "threatened" to convene a special meeting of the CDA to "recommend that a foreclosure action be commenced immediately and that the [CDA] would move to have a receiver appointed" unless Kearse "immediately addressed Spiritis' personal concerns about the project."

(4) Letter, dated December 27, 1995, from Spiritis to Kearse denying the request for funds, stating that Kearse should find a tenant who would either pay for the renovations out of its own pocket or use the space in its condition of disrepair, and "assert[ing] his power and control over Plaintiffs' funding for the rehabilitation project."

(5) Letter, dated December 5, 1996, from defendant Edwards to defendant Campbell stating that CDA "will have to take steps to protect the collateral if Campbell and the OHIA do not expedite their approval of the HUD refinancing."

(6) Letter, dated September 14, 1995, from the defendant Campbell to HUD stating that the County would submit a Section 108 application.

(7) Letter, dated February 18, 1997, from New York State Court Justice Edward McCabe to Bruce Blakeman regarding the availability of space at the 100 Main Street property to meet certain needs of the County's court system.

(8) Letter, dated May 15, 1996, from HUD to defendant Campbell stating that Nassau County's Section 108 application had been approved.

(9) Letter, dated February 26, 1997, from a private law firm to defendant Garner stating that Nassau County would delay filing a tax deed against the Bus Terminal property pending the refinancing.

(10) Letter, dated December 30, 1996, from defendant Garner to defendant Gulotta stating that HUD had approved the Section 108 application and requesting Gulotta to help complete the refinancing.

(11) Letter, dated May 28, 1996, from defendant Campbell to plaintiff Kearse stating that CEDC was not in default of its loan payment obligations.

Even under the generous light of Rule 12(b)(6) review, none of these letters constitute mail fraud because they do not constitute fraudulent misrepresentations as a matter of law, nor do they further the alleged scheme to defraud. "They are the usual and standard communications relating to [a proposed refinancing of a] real estate sale transaction. The Court finds that with regard to these letters, the

Amended Complaint does not allege mail fraud" *Mathon,* 875 F.Supp. at 997 (citing *United States v. Carpenter,* 791 F.2d 1024, 1035 [2d Cir.1986], *aff'd in part,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 [1987]).

### b. *Wire Fraud*

■ In a similar vein, the wire fraud statute, 18 U.S.C. § 1341, requires a scheme devised "to defraud, or for obtaining money or property by means of false or fraudulent pretenses, or promises," and the use of interstate wires or communications to execute the scheme. 18 U.S.C. § 1343.

The sole alleged act of wire fraud set forth in the RICO Case Statement is a facsimile from the defendant Spiritis to Colonia Insurance Company, which was copied to Viron, the plaintiff Kearse, the defendants Campbell and Edwards, and others. The substance of the fax is not disclosed, except a boilerplate characterization of the transmission as "written in furtherance of Defendants' wrongful plan, scheme and conspiracy." The claim of wire fraud based on this facsimile fails because it does not specify the content of the alleged misrepresentation. *See Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990).

As for the wire fraud allegations in the Complaint, it states that the unspecified "Defendants utilized interstate wires to further their scheme to illegally take the benefits and ownership of properties by numerous conversations and correspondences via telephone and facsimile between Defendants ... and HUD ... regarding the proposed refinancing of Plaintiffs' HUD Section 108 loan debt." This allegation is inadequate as a matter of law, as it fails to specify the time, place, and participants in the alleged acts of wire fraud. *Id.*

### c. *The Hobbs Act*

The Hobbs Act provides that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by ...

extortion or attempts or conspires so to do" shall be subject to criminal prosecution. 18 U.S.C. § 1951(a); *see also United States v. Alfonso,* 143 F.3d 772, 776 (2d Cir.1998). Title 18, Section 1951(b)(2) defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

The plaintiffs' theory, as expressed in the RICO Statement, is that defendants undertook activities designed to "extort" from the plaintiffs under "the color of official right", their agreement "to accept and employ Viron." The plaintiffs contend that when the CDA insisted that the contract for a general contractor to perform the work be put out for a public bid, rather than permit the CEDC to perform the work itself, then demanded that the contract be awarded to the next lowest bidder, Viron, rather than the CEDC, this constituted an act of extortion.

■ Extortion "under color of official right" is established by a public official's wrongful use of office. *See United States v. Margiotta,* 688 F.2d 108, 130 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *City of New York v. Joseph L. Balkan, Inc.,* 656 F.Supp. 536, 546 (E.D.N.Y.1987). Extortion under color of official right is committed where "the victims were motivated to make payments as a result of the defendant's control or influence over public officials and that the defendant was aware of this motivation." *United States v. McDonough,* 56 F.3d 381, 388 (2d Cir.1995) (citing *United States v. Margiotta,* 688 F.2d at 132–33). For example, in *Evans v. United States,* 504 U.S. 255, 268, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992), the Supreme Court held that "a public official [who] has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts," establishes extortion under "color of official right" under the Hobbs Act. In the Court's

view, even assuming that the CDA's demand of that the job be awarded to an outside contractor whose bid was second lowest to the CEDC's, it does not constitute an act of "extortion" as a matter of law, since it was not an improper use of the CDA's office to direct that the bid be awarded to the lowest outside bidder.

In view of the foregoing, the Court concludes that the plaintiffs have failed to adequately plead the predicate acts, and therefore, the substantive RICO claims must fail.

### d. *Pattern of Racketeering Activity*

■ Given that the plaintiffs have failed to plead the predicate acts, they necessarily cannot establish a pattern of racketeering activity. *See Katzman v. Victoria's Secret Catalogue,* 167 F.R.D. 649, 656 (S.D.N.Y.1996). In any event, they have not adequately pleaded a "pattern of racketeering activity."

As noted previously, "pattern" requires at least two acts of "racketeering activity", occurring within ten years of each other. *See* 18 U.S.C. § 1961(5). Both the Supreme Court and Second Circuit have held that an allegation of two acts of "racketeering activity", without more, is not sufficient to establish a pattern. *See H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 238–44, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *United States v. Indelicato,* 865 F.2d 1370, 1381 (2d Cir.) (en banc), *cert. denied,* 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989). To constitute a "pattern" of racketeering activity, the predicate acts must be related and constitute a threat of continued racketeering activity. *H.J. Inc.,* 492 U.S. at 238–44, 109 S.Ct. 2893, 106 L.Ed.2d 195; *United States v. Alkins,* 925 F.2d 541, 551 (2d Cir.1991) (predicate acts must be related and amount to or pose a threat of continued criminal activity). In addressing the determination about a "pattern" of racketeering activity, the Second Circuit noted that "[a]n interrelationship between acts, suggesting the existence of a pattern, may be

established ... [by] proof of their temporal proximity, or common goals, or similarity of methods, or repetitions." *Indelicato,* 865 F.2d at 1382. The Supreme Court explained, "RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity.... Congress was concerned in RICO with long-term criminal conduct." *H.J. Inc.,* 492 U.S. at 239, 242, 109 S.Ct. 2893.

The Second Circuit has addressed RICO's "pattern" element in terms of the nature of the alleged acts and the duration of the scheme, stating:

> in cases where the acts of the defendant or the enterprise were inherently unlawful, such as murder or obstruction of justice and were in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement, the courts generally have concluded that the requisite threat of continuity was adequately established by the nature of the activity, even though the period spanned by the racketeering acts was short. In contrast, in cases concerning alleged racketeering activity in furtherance of endeavors that are not inherently unlawful, such as frauds in the sale of property, the courts generally have found no threat of continuing criminal activity arising from conduct that extended over even longer periods.

*United States v. Aulicino,* 44 F.3d 1102, 1111–12 (2d Cir.1995). The alleged predicate acts in this case concern conduct falling into the latter category, in that such conduct is not inherently unlawful.

In this Court's view, the complained of acts do not constitute a pattern of criminal activity extending over a substantial period of time. *H.J. Inc.,* 492 U.S. at 241, 109 S.Ct. 2893. Nor do the complained of acts by their nature "project into the future with a threat of repetition." *Id.* In addi-

tion, this case involves a purported scheme with a limited goal, namely, to gain control over the Bus Terminal and Jackson Street properties. There is no threatened future action, and no allegation of long-term criminal conduct. The threat of continuity is not present in a situation where, as here, the plaintiffs had properties, the control "of which even if by fraudulent means, provided a natural end to [their] project." *Mathon*, 875 F.Supp. at 998–1000 (quoting *Aulicino*, supra at 1113).

Accordingly, the Court finds that the plaintiffs' substantive RICO claim was not sufficiently pleaded with regard to the "pattern" element. The substantive RICO claim is therefore dismissed.

### 3. *RICO Conspiracy*

■ The plaintiffs allege a violation of subsection 1962(d), which prohibits any conspiracy to commit a RICO violation. The RICO conspiracy claim largely incorporates the substantive RICO claims. For the reasons stated above, the plaintiffs have failed to adequately allege a substantive RICO claim. Accordingly, the RICO conspiracy claim is dismissed as well. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3rd Cir.1993) ("Any claim under § 1962[d] based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient.").

In view of the foregoing, the Court need not address the defendants' remaining arguments in favor of dismissing the RICO claims. The defendants' motions to dismiss the substantive RICO claim, and the RICO conspiracy claim is granted as to all the defendants.

### C. § 1983 Conspiracy: Due Process /Takings Claim and Equal Protection Claim Against All the Defendants

■ As noted previously, the Complaint alleges that all of the individual defendants conspired to violate the plaintiffs' constitutional rights to due process and equal protection by: (1) wrongfully taking, without just compensation, the Properties at issue; (2) interfering with the plaintiffs' right to receive approved Section 108 loan guarantees; (3) maliciously interfering with the plaintiffs' right to manage and control their property; and (4) violating the express terms of the social services agreement between the EOC and the County by refusing to reimburse EOC for legal fees that it incurred and continues to incur as a result of the defendants' allegedly wrongful conduct.

With respect to the Village, the County and the CDA, the Complaint alleges that these defendants, acting through municipal officers at the insistence of final policymakers and as the result of an unannounced municipal policy to acquire valuable property in urban renewal areas, knowingly and purposefully conspired to violate the plaintiffs' due process and equal protection rights by: (1) wrongfully and illegally taking, without just compensation, the properties at issue; (2) interfering with the plaintiffs' right to receive approved Section 108 loan guarantees; (3) maliciously interfering with the plaintiffs' right to manage and control their property; and (4) violating the express terms of the social services agreement between the EOC and the County by refusing to reimburse EOC for legal fees that it incurred and continues to incur as a result of the defendants' allegedly wrongful conduct.

As to the defendant the CDA Commissioner Spiritis, the Village and the CDA, the Complaint states that these defendants, acting through final policy makers and pursuant to the CDA's unannounced policy of improperly asserting control over private properties in the Village, violated the plaintiffs' due process and equal protection rights by "circumventing the legally agreed upon bidding procedures so as to ensure that contractors subject to their influence and control would be hired," thereby undermining the plaintiffs' abili-

ties to meet their mortgage or tax payments.

### 1. *Takings Claim*

All of the defendants seek dismissal of the plaintiffs' claim under the Takings' Clause. The arguments center on the following theories: (1) the claim is unripe, because they failed to pursue state court procedures for obtaining just compensation; (2) the plaintiffs cannot establish a constitutionally protected property interest in either the Section 108 loan guarantee, the outcome of the competitive bidding process for a public contract with the Bureau of Traffic Violations, or the reimbursement of expenses under the DSS Agreement; (3) the allegations in the Complaint are too vague to support a conspiracy claim; (4) the CDA municipal officials are absolutely immune from suit for results arising from their legislative acts.

"To state a takings claim under section 1983, a plaintiff must show (1) a property interest (2) that has been taken under color of state law (3) without just compensation." *Frooks v. Town of Cortlandt*, 997 F.Supp. 438, 452 (S.D.N.Y.1998) (citation omitted). "With respect to the third element, the plaintiffs must allege that they exhausted state procedures for obtaining just compensation." *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 195, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). As the Supreme Court explicitly stated in *Williamson*, "[i]f a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." 473 U.S. at 195, 105 S.Ct. 3108.

#### a. *Ripeness*

Here, the plaintiffs were required to "first seek compensation from the state if the state has a 'reasonable, certain and adequate provision for obtaining compensation.'" *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 379–80 (2d Cir.1995), *cert. denied*, 519 U.S. 808, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996) (quoting *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. at 194, 105 S.Ct. 3108, 87 L.Ed.2d 126); *see also Frooks*, 997 F.Supp. at 453 (stating that "a 'taking' is not 'without just compensation' under section 1983 unless a plaintiff has exhausted all state remedies that may provide just compensation"). The State of New York has established remedies for just compensation claims, under the New York EDPL § 101 *et seq.* and Article 78, that meet all constitutional requirements. *See Hellenic American Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 881 (2d Cir.1996) (Article 78 proceeding is "perfectly adequate postdeprivation remedy in ... situations" involving property interests): *Frooks*, 997 F.Supp. at 452 (holding that the EDPL meets all constitutional requirements).

#### b. *Protectable Property Interest*

With respect to the creation of a property interest, the Supreme Court has explained that:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.... Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249–50 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987);

*Impact Shipping, Inc. v. City of New York,* No. 95 Civ. 2428, 1997 WL 297039, at *4 (S.D.N.Y. June 3, 1997). Thus, to determine whether the plaintiff has a claim of entitlement, it is necessary to consider the applicable state law, contract, or regulation that purports to establish the benefit. The Plaintiffs contend that they have a property interest in the following: (1) restructuring CEDC's debt through a HUD Section 108 loan guarantee; (2) the outcome of a competitive bidding process for a public contract with the Bureau of Traffic Violations; and (3) reimbursement of legal expenses under the DSS Agreement.

### (1) *The DSS Agreement*

With respect to the DSS Agreement, the unlawful takings claim is based on the plaintiffs' underlying contract action. However, this Circuit has not extended property protection to contractual rights. *See, e.g., S & D Maintenance Co., Inc. v. Goldin,* 844 F.2d 962 (2d Cir.1988) (holding that claims for payment under City contract for services already rendered did not rise to constitutionally protectable property interest: "the doctrinal implications of constitutionalizing all public contract rights would raise substantial concerns").

### (2) *The Section 108 Loan Guarantee*

As to the restructuring CEDC's debt through a HUD Section 108 loan guarantee, the plaintiffs can point to no statute, regulation or contract requiring Nassau County to obtain Section 108 funding for the plaintiffs' benefit. *See Norfolk Federation of Business Districts v. Dept. of Housing and Urban Development,* 932 F.Supp. 730, 742 (E.D.Va.1996) ("the language of § 108 does not create enforceable rights in persons allegedly affected by projects funded by loan guarantees granted under its terms"). Notably, the CEDC is not eligible to apply for Section 108 funding directly, since "applications for assistance ... may be submitted only by eligible public entities." 42 U.S.C. § 5308(q)(3). "Where, as here, official ac-

tion is discretionary, 'one's own interest in a favorable decision does not rise to the level of a property right entitled to' due process protection." *X–Men Security, Inc. v. Pataki,* 983 F.Supp. 101, 114 (E.D.N.Y.1997) (quoting *Walentas v. Lipper,* 862 F.2d 414, 419 [2d Cir.1988], *rev'd in part on other grounds sub nom. Terminate Control Corp. v. Horowitz,* 28 F.3d 1335 [2d Cir.1994] ).

### (3) *The Bid for a Public Contract with the Bureau of Traffic Violations*

Similarly unavailing is the plaintiffs' claimed property interest in the outcome of a competitive bidding process for a public contract with the Bureau of Traffic Violations. "[A]lthough a public contract can confer a protectable benefit, not every contract does so, and the type of interest a person has in the enforcement of an ordinary commercial contract often 'is qualitatively different from the interests the Supreme Court has thus far viewed as "property" entitled to procedural due process protection.'" *See Martz v. Incorporated Village of Valley Stream,* 22 F.3d 26, 30 (2d Cir.1994) (quoting *S & D Maintenance Co. v. Goldin,* 844 F.2d at 966) (additional citations omitted).

Here, the plaintiffs do not have a protected property interest by virtue of the failed bid. Under New York law, "[n]either the low bidder nor any other bidder has a vested property interest in a public works contract." *In re Conduit & Foundation Corp. v. Metropolitan Transp. Auth.,* 66 N.Y.2d 144, 148–49, 495 N.Y.S.2d 340, 343, 485 N.E.2d 1005 (1985); *see also Terminate Control Corp. v. Horowitz,* 28 F.3d at 1343 (stating that "New York law ... bars an entity that submits a low bid on a public contract from any recovery of damages from a municipality for rejecting the low bid").

Accordingly, the plaintiffs' Section 1983 due process/takings claim is dismissed in its entirety because it has not been sufficiently pled.

2. *Equal Protection*

■ To state a claim under the Equal Protection Clause, a plaintiff must allege that: (1) the person, compared with others similarly situated, was selectively treated; and (2) such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. *See Crowley v. Courville,* 76 F.3d 47, 52–53 (2d Cir.1996); *Zahra v. Town of Southold,* 48 F.3d 674, 683–84 (2d Cir. 1995); *LaTrieste Restaurant & Cabaret Inc. v. Village of Port Chester,* 40 F.3d 587, 590 (2d Cir.1994).

■ As to the first element of an equal protection cause of action, the plaintiff must adequately allege that it was similarly situated to other entities which were actively pursuing Section 108 loan guarantees through the County, but were nevertheless treated differently. The best explanation for determining whether other persons are "similarly situated" was set forth in *The Dartmouth Review v. Dartmouth College,* 889 F.2d 13 (1st Cir.1989), and previously cited by this Court in *Equus v. Town of Southampton,* 37 F.Supp.2d 582, 597-98 (E.D.N.Y. 1999) and *Kirschner v. Zoning Board of Appeals of Valley Stream,* 924 F.Supp. 385, 391 (E.D.N.Y.1996), as follows:

> The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as in the lawyer's art of distinguishing cases, the "relevant aspects" are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely or necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.

*Dartmouth Review,* 889 F.2d at 19; *see also Carey v. Mt. Desert Island Hosp.,* 156 F.3d 31 (1st Cir.1998) (quoting *Molloy v. Blanchard,* 115 F.3d 86, 91 [1st Cir.1997] ).

■ Applying these standards, the Court finds that the plaintiff's equal protection claim is insufficiently pled. There are no allegations regarding similarly situated entities which were treated differently from the plaintiffs. *See A.B.C. Home Furnishings, Inc. v. Town of East Hampton,* 947 F.Supp. 635 (E.D.N.Y.1996). In fact, there are no allegations regarding similarly situated entities at all. Accordingly, the defendants' motion to dismiss the plaintiffs' equal protection claim, pursuant to Rule 12(b)(6), is granted.

D. **Section 1983/*Monell* Claim Against All Defendants**

■ Raising the same allegations set forth in the First Cause of Action, the plaintiff alleges that those acts "are and constitute official acts and policy of the municipal entities which are defendants herein." This claim also fails as a matter of law.

A Section 1983 claim made against a municipality must also allege the deprivation was caused by a custom or policy of the municipality, and may not simply be based on a theory of respondeat superior. *Monell v. Dep't of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Villante v. Dep't of Corrections,* 786 F.2d 516, 519 (2d Cir.1986).

Applying such principles to the Complaint, the *Monell* claim must be dismissed. The plaintiffs do not proffer any facts in support of the conclusory allegation that the defendants' conduct amounts to a custom or policy, or that this custom or policy caused the plaintiffs' injuries. *See Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993) (noting that "[t]he mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference"). This is true even under the liberal notice pleading standard set forth in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination*

*Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). Simply stated, "bald assertions and conclusions of law" do not prevent the dismissal of a complaint pursuant to Fed.R.Civ.P. 12(b)(6). *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir.1994). For these reasons, the defendants' motions to dismiss the *Monell* claim are granted.

### E. State Law Claims

Having dismissed the Section 1983 and RICO claims, all that remains are the plaintiffs' state law causes of action. The exercise of supplemental jurisdiction is left to the discretion of the district court, 28 U.S.C. § 1367(a)(c); *see also Travelers Ins. Co. v. Keeling,* 996 F.2d 1485, 1490 (2d Cir.1993). Section 1367(c) of Title 28 provides, in part, that the district courts may decline to exercise supplemental jurisdiction over a claim "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. 1367(c)(3). "[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Castellano v. Board of Trustees, et al,* 937 F.2d 752, 758 (2d Cir.1991).

This Court, in an exercise of its discretion, declines to exercise supplemental jurisdiction over the pendant state law claims. Given that discovery apparently may not have even begun, the dismissal of all the federal claims warrants dismissal, without prejudice, of the state law claims as well.

### F. Leave to Replead

The Court grants the plaintiffs' application for leave to replead and file a Second Amended Complaint within 20 days of the date of the entry of the Order. However, the plaintiffs are cautioned about perfunctory or cosmetic changes. "[I]t has become an all too common practice for litigants granted leave to replead to make only minor changes in the original complaint based on an overly restrictive reading of the dismissing court's order,

prompting a second motion to dismiss. An amended complaint which fails to replead with sufficient particularity after a finding of lack of specificity may well be regarded by the Court as a frivolous filing in violation of Fed.R.Civ.P. 11." *Harrison v. NBD Inc.,* 990 F.Supp. 179, 185 (E.D.N.Y. 1998) (quoting *Spier v. Erber,* 1990 WL 71502 [S.D.N.Y.1990] ). In the event the plaintiff files another amended complaint that is insufficiently pled or not in accord with this Memorandum of Decision and Order, the Court may take such appropriate action.

### III. CONCLUSION

Having reviewed the parties' papers, and heard oral argument, it is hereby

**ORDERED,** that the Court grants the motions to dismiss all of the claims in the Complaint by the Village defendant, the Nassau County defendants, and the CDA defendants, and the Complaint is dismissed in its entirety as to all the defendants, without prejudice and with leave to file a Second Amended Complaint within 20 days from the date of this Order, namely, on or before May 17, 1999. Failure to timely file an amended complaint on or before May 25, 1999 will result in dismissal of the entire case with prejudice.

**SO ORDERED.**